MENYUK, J.T.C.
Plaintiff International Schools Services, Inc. (“ISS”) filed direct appeals with this court contesting an omitted assessment- for tax year 2002 and an added assessment for tax year 2003 on four office condominium units located at 15 Roszel Road in the defendant municipality of West Windsor Township. The issue on these cross-motions for summary judgment is whether the subject property is entitled to exemption from local property taxation as property actually used in the work of an association or corporation organized exclusively for the moral and mental improvement of men, women, and children.
ISS contends that it meets all the requirements for exemption set forth in N.J.S.A. 54:4-3.6. Defendant responds that, notwithstanding the original educational purposes for which ISS was organized, it is now a diversified entity providing services through affiliated for-profit entities that are not educational in nature and cross-moves for an order of summary judgment declaring that the *555 subject property is not exempt. For the following reasons, I conclude that ISS is not organized exclusively for the moral and mental improvement of men, women, and children and that the subject property is not exempt from taxation.
I.
FACTUAL BACKGROUND
The subject property is identified on the Tax Map of West Windsor as Block 9, Lots 63.11, 63.13, 63.14 and 63.15. Plaintiff acquired the property in 1989. It had been listed as tax exempt from 1990 until October 2003, when the contested assessments were made pursuant to N.J.S.A. 54:4-63.26 to -63.29 (containing procedure for assessing property which ceases to be exempt). Those assessments were for the full twelve months of both 2002 and 2003 and were the same for both tax years. The assessments are as follows:
Lot 63.11 Lot 63.13 Lot 63.14 Lot 63.15
Land $ 585,900 $241,500 $168,200 $525,100
Improvements $1,171,700 $517,400 $360,500 $401,300
Total $1,757,600 $758,900 $ 528,700 $926,400
A portion of the subject property is leased to other entities, some of which are for-profit companies and others of which may be nonprofit entities. It appears that ISS and the defendant municipality have, over the years, agreed upon the portion of the property that is subject to local property taxation on account of these tenants and ISS has paid property tax on the space it rents to proprietary corporations. According to the defendant, the taxes paid by ISS represent 4553 square feet of the subject’s 48,000 square feet. Daniel Scinto, ISS executive vice president for administration and finance, certified that, during 2002 and 2003 respectively, those taxes amounted to $20,089.08 and $20,850.03. According to the financial statements of ISS for the years ending June 30, 1998 through June 30, 2003, ISS received rental income in each of those years ranging from $125,870 in 1998 to $226,457 in 1999.
*556 ISS was founded in 1955 and is a private, non-profit corporation organized under the laws of the District of Columbia. At all relevant times, it has been qualified as tax exempt under I.R.C. § 501(c)(3). The ISS certificate of incorporation states, in relevant part, that:
The purpose or purposes which the Corporation will hereafter pursue are: (1) to aid, promote and encourage, by all appropriate means including gifts of money or other property, or by other means, schools, facilities, and other organizations that are exclusively educational in character, (2) to foster the provision of education by the payment of salaries, fellowships and grants to teachers and instructors, and (3) to devote all or a part of the income and any or all of the principal of any property, real or personal, to the furtherance and support of projects and institutions that are exclusively educational; provided, however, that no part of the net earnings of such schools, facilities, projects, institutions and other organizations inures to the benefit of any private shareholder or individual____
According to the certification of Dr. John M. Nicklas, president of ISS, the plaintiff was founded in response to the rapid post-World War II growth of schools located abroad that enrolled American children. The goal of ISS was to remedy the shortcomings of such schools and to enhance the quality of the education provided to American students. In general, the educational institutions ISS intended to assist included independent schools and schools that had been associated with American companies that no longer wished to be in the business of establishing and running schools. The latter educate dependents of corporate employees assigned overseas.
During the time period in issue, ISS had several corporate clients for which it provided school management and educational consulting services, centered on the needs of dependents of corporate employees posted abroad. In his deposition testimony, Dr. Nicklas estimated that of the 250 to 300 clients with which ISS has contracts, ten to fifteen are corporate clients. ISS currently receives forty to forty-five percent of its gross income from its corporate clients. Past and/or present corporate clients include Unocal, BP-Amoco, Arco, Lockheed Martin, and Union Carbide. ISS also assists in the corporate relocation of employees overseas by publishing for sale an overseas school directory, which provides information for human resource managers regarding schools in other countries.
*557 According to Dr. Nicklas, most of the overseas schools that serve Americans and are clients of ISS are nonprofit, nondenominational, and independent. These schools incorporate American educational programs, but are generally open to nationals of other countries and the teaching staffs are multinational. The content of the curriculum is usually American, but can vary depending on the proportion of students from the host country. At present, only fifty percent of the students at schools serviced by ISS pursuant to contracts with corporate clients are United States citizens. Approximately twenty-five percent of the students at schools not affiliated with corporate clients are United States citizens.
With respect to the activities it performs for overseas schools, ISS compares itself as the functional equivalent of a local school board. Among the services ISS provides are the establishment and operation of overseas schools, evaluation of the educational programs of such schools, recruitment and evaluation of staff, negotiation of faculty and administrative salaries, negotiation of school budgets, establishment of procedures and curricula, and assistance in the accreditation process. It also provides guidance to heads of schools in connection with programs, parent relations, and school policies. According to its federal Form 990 filed for the fiscal year beginning July 1, 2001 and ending June 30, 2002, ISS served approximately 2,008 students in this capacity.
A. Schools Management
ISS sets its fees for operating schools in accordance with what Dr. Nicklas described as a matrix that includes factors such as the number of children to be enrolled and geographic location (which includes elements of hardship and political danger). The same matrix applies to independent schools and schools with corporate sponsorship. According to its audited financial statements for fiscal years ending June 30, 1998 through June 30, 2003, ISS realized a profit from its school management services. That is, the revenues from those services exceeded associated expenses for school management services in each of those years before taking into account general and administrative expenses.
*558 Between fiscal years ending June 30, 1998 and June 30, 2003, revenues from school management services ranged from $14,609,942 in the fiscal year ending June 30, 2001, to $16,054,032 in the fiscal year ending June 30, 2000. Associated expenses ranged from $12,678,372 in the fiscal year ending June 30, 2001, to $13,982,558 in the fiscal year ending June 30, 2000.
In addition to the management services it performs for client schools, ISS purchased a school of its own, the Cayman International School, Grand Cayman, Cayman Islands, through a Cayman Islands subsidiary, ISS (Cayman) LTD., in December 2002 for a purchase price of $1,275,000. There is some dispute as to whether the school is a for-profit entity. According to the contract of sale, the sellers appear to be private individuals and the purchaser is described as an “ordinary resident company incorporated under the laws of the Cayman Islands.” Mr. Scinto certified that defendant’s characterization of the school as profit-making is incorrect and that it is his understanding that the government of the Cayman Islands treats the school like a charitable organization. The school is exempt from the payment of stamp duties which Mr. Scinto represents are the only Cayman imposts. Mr. Scinto further certified that ISS receives a management fee of approximately $25,000 per year for educational services rendered to the Cayman International School, which fee is “in line” with fees paid by other ISS clients. Mr. Scinto further represents that the school is not a profitable venture, having lost approximately $40,000 in 2003. The financial statement for ISS fiscal year July 1, 2002 to June 30, 2003 indicates revenues of $463,208 and expenses of $489,251 for the Cayman International School, or a loss of approximately $26,000. The notes to the financial statements for the same period, however, state that the school prior to its purchase was a for-profit entity. In either event, I do not find the issue of whether the Cayman International School is regarded as a for-profit entity by the Cayman Islands government to be material to this motion.
B. Procurement
ISS also procures curricular and educational materials, as well as equipment and furniture for client schools. Through consul *559 tants, it supervises the installation of equipment and the assembly and placement of furniture. ISS annually sends to schools catalogs of educational materials, furniture, and equipment. ISS orders those items that the school requests, consolidates the orders for shipment, and ships the items requested to the schools. According to Dr. Nicklas, ISS obtains more generous discounts from suppliers than individual schools could obtain on their own because of the size of the orders it places and ISS passes those additional discounts on to the schools. ISS nevertheless realizes a profit on its procurement services. According to its financial statements, the revenues and expenses attributable to these services, before taking into account general and administrative expenses were:
Year Ending Revenues from School Expenses Attributable to June 30 Supply Services School Supply Services
1998 $22,915,837 $20,729,912
1999 $17,840,152 $16,067,216
2000 $17,960,966 $15,903,202
2001 $16,253,934 $14,368,839
2002 $15,279,554 $13,570,985
2003 $13,955,810 $12,514,167
C. Recruiting and Staffing
ISS also recruits administrators and teachers for overseas schools. ISS is, itself, the employer of the staff at many of the schools it services. It charges an application fee to applicants for overseas positions of $100 to $150 for setting up a credentials file. During 2003, ISS received between 1,500 and 2,000 applications that were incorporated into its database. According to Dr. Nick-las, ISS probably received additional applications from applicants who were not ultimately added to the database. If an applicant wishes to attend one or more of the three job fair-like conferences held annually by ISS, there is an additional fee of $300 to $350 for all conferences in a year. There is no placement fee if an applicant obtains a position. Schools pay an annual fee to obtain access to plaintiffs candidate pool and to attend the conferences. The fee is based on the size of the school and ranges from $500 to $10,000. ISS charges an additional fee if a school wishes to *560 advertise faculty positions in the ISS newsletter. ISS also makes its recruitment services available on a fee-for-service basis. ISS revenues from educational staffing for the fiscal years ending June 30,1998 through June 30, 2003, before taking into account general and administrative expenses, are set forth in the following chart. No expenses were allocated to this service in the financial statements of ISS.
Fiscal Year Ending June 30 Revenues from Educational Staffing
1998 $ 950,977
1999 $1,059,994
2000 $1,136,913
2001 $1,314,330
2002 $1,220,268
2003 $1,467,860
D. Establishment and Operation of Fund-Raising Foundations
A significant portion of services offered by ISS is directed at helping schools abroad establish fund-raising foundations and assisting them in operating such foundations. These foundations are generally organized for the benefit of a specific school. The fees charged by ISS for its services in connection with the establishment, maintenance, and operation of foundations are on a fee-for-service basis.
According to exhibits constituting pages from the website maintained by ISS, overseas schools use foundations incorporated in the United States for two purposes: to raise money for both specific and general school needs and to make payments on behalf of the school, including payroll, which allows the teaching staff to participate in the federal Social Security program, retirement programs such as TIAA/CREF, and unemployment and disability insurance. ISS acts as the agent for the United States-based foundations supporting the overseas schools.
ISS recommends legal counsel to assist in the creation of the foundations and acts as liaison between the school and legal counsel. Once the foundation is established, ISS processes the annual governmental filings necessary to maintain foundation status. It can also oversee the logistics of foundation board matters *561 such as meetings, agendas, by-laws’ maintenance, and “legal communication.”
In connection with the fundraising function, ISS assists schools with fundraising by referring overseas schools to schools with successful fundraising efforts or to persons involved with fundrais-ing for other schools. ISS receives and acknowledges contributions on behalf of the foundations.
E. Payroll, Insurance, Investment, and Foundation Management Services
In connection with the second component of the foundation services provided by ISS, a school may contract with ISS to process teachers’ paychecks through its foundation program, whereby ISS will send payments to a teacher’s medical benefit plan, deduct and make payment for certain employment-related taxes, and send a check, net of deductions, to the teacher.[1] ISS, on behalf of a foundation, will establish, maintain, and reconcile bank accounts in the United States to facilitate the payment of invoices. At the request of a school, ISS will handle investments such as bank certificates of deposit, treasury bills, and corporate bonds for the foundation.
The ISS website also notes that:
ISS can assist in obtaining a pension plan, health, life and long-term disability insurance plans, or any other benefit plan or combination of plans that suits the needs and requirements of the foundation employees. Once the plan(s) is established, ISS can handle the administrative process, including enrollment/termination, forwarding monthly reports and remittances, assisting with claims processing, and filing the annual government reports.
ISS appears to have realized a profit from its foundation management services. Its revenues and expenses before accounting for general and administrative expenses were as follows:
Expenses Attributable to
*562 Fiscal Year Revenue from Foundation Foundation Management Ending Management Services Services
1998 $377,378 $32,294
1999 $431,107 $83,952
2000 $376,894 $60,196
2001 $313,262 $31,026
2002 $332,730 $36,813
2003 $365,007 $30,337
F. Referral Services
In 1999, ISS formed certain strategic alliances with unrelated, profit-making entities. Such entities were described on an announcement issued by ISS as part of the ISS “team of dedicated businesses and staff, brought together to assist schools in their quest for excellence.” The entities included the Hillier Group, for architecture and site planning, Insurance Services International for insurance, emTech for technology, and the Cambridge Group for strategic planning. ISS received between $50,000 and $75,000 in endorsement fees from Insurance Services International. $50,000 was paid to ISS in 2002, one of the tax years in issue here. ISS received no endorsement fees in 2003. ISS does refer these entities to schools that have a need for the services provided by these companies, but does not receive any referral fees.
ISS financial statements indicate that ISS’ revenues are derived almost entirely from the program activities described above, as well as from the rental income previously noted. It also receives dividend and interest income and has occasionally received small government grants. The federal Form 990 for the fiscal year ending’June 30, 2002, listed a government grant of $31,800. As set forth above, ISS’ principal programs have consistently operated at a profit. Mr. Scinto certifies, however, that in four out of the last six years for which ISS has operating results, ISS has experienced substantial net losses from operations ranging from $1,211,708 in 1999 to $95,347 in 2000. I find from the financial statements submitted as exhibits to Mr. Scinto’s initial certification that the net losses from operations are somewhat different than set forth in the certification, but that ISS did, nevertheless, suffer losses in most years. Total revenues and gains from *563 program income, rental and investment income, and total expenses were as follows:
Fiscal Year ending Total Revenues June 30 and Gains Total Expenses Profit (Loss)
1998 $40,692,894 $41,613,206 ($920,312)
1999 $34,838,382 $35,691,830 ($853,448)
2000 $36,144,745 $36,070,459 $ 74,286
2001 $33,134,218 $32,804,500 $329,718
2002 $33,280,330 $33,300,974 ($ 20,644)
2003 $31,663,021 $32,069,699 ($406,678)
That ISS’ programs are generally profitable while its operations frequently result in losses appears to be a consequence of relatively large “general and administrative” expenses. According to the notes to the financial statements:
The costs of providing program services and support services of the Organization have been summarized on a functional basis in the statements of activities. Accordingly, certain operating costs have been allocated among the functional categories.
The Organization’s primary program services are school management, school supply, foundations management and publications. Expenses reported as general and administrative are incurred in support of the primary program services.
No detail was provided as to what expenses of the primary program services were allocated to the “general and administrative” category, as opposed to those that were assigned to the specific program service. General and administrative expenses ranged from a high of $6,478,661 (year ending June 30, 1998) to a low of $5,181,603 (year ending June 30, 2001).
G. International Schools Foundation, Inc. (Nonprofit)
In 1999, an entity known as the International Schools Foundation, Inc. (“ISF”), was formed as a nonprofit corporation under Title 15A of the New Jersey Statutes. According to its certificate of incorporation, ISF was organized and was to be operated exclusively for the benefit of ISS. Its powers included, without limitation, the authority to distribute funds and make contributions to ISS; to acquire, hold, manage and use for the purpose of benefiting ISS any real, personal, tangible or intangible property; to convey, sell or otherwise dispose of such property, and to invest, reinvest, and manage the same. The board of trustees of *564 ISF consists of former or current ISS chairs and Dr. Nicklas, as president of ISS. At its formation in 1999, all but one of the ISF trustees were also trustees of ISS. Dr. Nicklas serves as president of ISF in addition to his duties as president of ISS, but does not receive a separate salary from ISF. ISF has no separate office, and to the extent that it requires a mailing address, it uses that of ISS. Dr. Nicklas testified at his deposition that ISF “supervises the missions of ISS and ISG [International Schools Group, Inc., described in more detail below], so that the missions remain true to the original mission and their organizational structure.”
H. International Schools Group, Inc. (For-Profit)
ISG was incorporated in 1999 as a for-profit corporation under Title 14A of the New Jersey Statutes. Its certificate of incorporation provides that:
The purpose for which the corporation is organized is to engage in any and all activities with respect to which corporations may be organized under the New Jersey Business Corporation Act, and any and all activities incidental thereto. The corporation expects to be engaged in the following activities!:] establishment of partnerships with other for-profit organizations, capital development, cash management, and the administration of individual retirement plans.
The ISG certificate of incorporation provides for both voting and non-voting classes of common stock. According to ISG’s federal income tax return for the tax year July 1, 2002 to June 30, 2003, all of the voting stock of ISG is owned by ISF. The tax return also disclosed that ISG owns fifty-one percent of the stock of an entity called ISS Financial and Insurance Network (“ISS-FIN”), which is described in more detail below. At his deposition, Dr. Nicklas testified that ISG was set up to form relationships with insurance and financial organizations that would set up insurance plans and retirement plans for international school teachers. When ISG was formed, it was headed by a person who has since left the organization. The duties of the president of ISG have been assumed by Dr. Nicklas, who does not receive any separate compensation from ISG. According to Dr. Nicklas, ISG operates out of the subject property, but does not occupy any space. It uses the address of ISS.
*565 The notes to the financial statements of ISS for the years ending June 30, 1999 and 2000 state that ISF and ISG were formed with the assistance of ISS and that in January 2000, ISS entered into an unsecured line of credit agreement to provide operating capital for ISG in an amount not to exceed $100,000. That amount was later increased to $300,000 and then to $400,000. For each of the years thereafter, through the fiscal year ending June 30, 2003, there were outstanding balances due from ISG. As of June 30, 2003, the outstanding balance due ISS from ISG was $318,965.
I. IRS Letter Ruling Relating to ISS, ISF and ISG
In 1999, ISS and ISF requested a letter ruling from the IRS for the purposes of ascertaining the tax consequences of the formation of ISF, which was described as a non-profit holding company that would become the sole member of ISS. Among other things, the letter asked that the IRS issue rulings that: (1) ISF is a tax-exempt organization under I.R.C. § 501(c)(3); and (2) ISG’s for-profit activities will not jeopardize the tax-exempt status of either ISS or ISF. The request stated that ISF’s only activities will be to assist ISS achieve its exempt purposes of supporting, providing, and encouraging American style education overseas by providing money to ISS which ISF receives as a result of its fund raising programs and from distributions from ISG. The request further represented that:
Initially, ISF will share all facilities, equipment, employees and other assets in allocated portions with ISS which will be accurately recorded on each company’s books and records. ISF will reimburse ISS, at a fair rental value, for the use of the facilities, equipment and other assets owned by ISS. Likewise, shared employees will be compensated by each company in accordance with the amount of time such employees devote to each company. This practice will decrease substantially once ISF is able to establish itself at a separate office and hire its own employees.
With respect to ISG, the letter set forth the proposed activities of the company as set forth in its certificate of incorporation and noted that ISG’s initial board of directors had seven members, only one of whom, Dr. Nicklas, was also a trustee of ISF and ISS. The letter represented that:
*566 Initially, ISG will share certain facilities, equipment and other assets in allocated portions with ISS which will be accurately recorded on each company’s books and records. All of its relationships with ISF and ISS will be at arms length. Therefore, ISG will reimburse ISS, at fair rental value, for the use of the facilities, equipment and other assets owned by ISS. It is not anticipated that any employees of ISG will be shared with either ISF or ISS. However, if such sharing of employees is required, all shared employees will be compensated by each company in accordance with the amount of time such employees devote to each company. It is anticipated that ISG will eventually be located at a separate office. It is important to note that ISG, at all times, will maintain separate bank accounts and have its own stationery and telephone lines.
ISG intends to make periodic distributions to its parent company, ISF. In turn, ISF will use a portion of these funds to operate its company, and will contribute the remainder to ISS to assist this non-profit company achieve its Exempt Purposes.
The IRS issued a letter ruling on June 20, 2000, making the rulings that ISF and ISS had requested.
J. ISS Financial and Insurance Network (For-Profit)
As noted above, ISG owns fifty-one percent of the stock of ISSFIN, which was incorporated in May 2002 as a for-profit corporation under the provisions of the New Jersey Business Corporation Act, N.J.S.A. 14A:1-1 to 14A:16-4. Dr. Nicklas and Mr. Scinto were the initial members of the board of directors. Dr. Nicklas testified at his deposition that he remains a member of the board of ISSFIN and is, in fact, the chairman of the board. In connection with the formation of ISSFIN, ISS and Gables Financial Group, Inc. issued a press release announcing the formation of the new corporation, which was described as “a financial and insurance services brokerage.” The press release indicated that the operations of ISSFIN would be headquartered in Coral Gables, Florida, and a regional sales and marketing office would be created at ISS headquarters in Princeton [sic], New Jersey. ISSFIN does lease space from ISS at the subject property and that leased area is one of those for which ISS pays local property taxes.
The press release went on to state:
The ISS Financial and Insurance Network will serve the market with a full slate of insurance products and services for teachers and administrators, including medical, life, and disability products, as well as various business and liability coverages for the international schools. In addition, the ISS Financial and Insurance Network is *567 currently marketing products for individual financial security through a strategic partnership with Raymond James Financial, and has entered negotiations for a strategic alliance to provide capitalization products for schools.
ISS was formed in 1955 to serve the interests of the international school community, and provides personnel recruiting, operations management, and purchasing services to schools, foundations and other teaching facilities (such as hospitals). John Nieklas says, “Providing financial and insurance products is a natural extension of our original mission.”
II.
ANALYSIS
These motions are made pursuant to R. 4:46-2(c), which provides that summary judgment should be granted when “the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law.” R. 4:46-2(c). “By its plain language, the Rule dictates that a court should deny a summary judgment motion only where the party opposing the motion has come forward with evidence that creates a ‘genuine issue as to any material fact challenged.’” Brill v. Guardian Life Ins. Co. of America, 142 N.J. 520, 529, 666 A.2d 146 (1995). The court must consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party. Brill, supra,, 142 N.J. at 540, 666 A.2d 146.
I conclude that any issues of fact raised by the parties, such as, for example, whether the Cayman International School purchased by ISS is a for-profit entity, are not material to my decision on these motions. Accordingly, the matter is ripe for summary judgment.
Because they represent a departure from the fundamental approach of our statutes that all property bear its just and equal share of the public burden of taxation, exemption statutes are strongly construed against those claiming exemption. Princeton University Press v. Bor. of Princeton, 35 N.J. 209, 214, 172 *568 A.2d 420 (1961). Those claiming exemption have the burden of establishing their entitlement to it. Ibid. But as noted in one of the leading cases construing the “moral and mental improvement” exemption, that principle does not justify distorting the language or the legislative intent. Paper Mill Playhouse v. Millburn Tp., 95 N.J. 503, 507, 472 A.2d 517 (1984) citing Boys’ Club of Clifton, Inc. v. Jefferson Tp., 72 N.J. 389, 398, 371 A.2d 22 (1977). As always, the judicial function is to determine the legislative intent as expressed in the statute, and while the construction of the statute must be strict, it must be reasonable, and not used to defeat the evident legislative purpose. Ibid.
It is well settled that the exemption enjoyed by ISS for purposes of federal income taxation is irrelevant to the inquiry here. Presbyterian Homes of Synod of N.J. v. Division of Tax Appeals, 55 N.J. 275, 286 n. 3, 261 A.2d 143 (1970); Black United Fund of New Jersey, Inc. v. East Orange City, 17 N.J.Tax 446, 449 (Tax 1998), aff'd 19 N.J.Tax 480 (App.Div.2001). The statutory requirements for the mental and moral improvement exemption provided by N.J.S.A. 54:4-3.6 were set forth in Paper Mill Playhouse v. Millburn Tp., supra, 95 N.J. at 506, 472 A.2d 517. A claimant must demonstrate that: (1) it is organized exclusively for the moral and mental improvement of men, women and children; (2) the subject property must actually be used for the tax exempt purpose;[2] and (3) the operation and use of its property must not be conducted for profit. Id. at 506, 472 A.2d 517.
Whether ISS is organized exclusively for the moral and mental improvement of men, women and children must be determined from its organizational documents. Black United Fund v. East Orange City, supra, 17 N.J.Tax at 455; 1711 Third Avenue, *569 Inc. v. Asbury Park City, 16 N.J.Tax 174 (Tax 1996); Planned Parenthood of Bergen County, Inc. v. Hackensack City, 12 N.J.Tax 598, 610 n. 6 (Tax 1992), aff'd 14 N.J.Tax 171 (App.Div. 1993). The ISS certificate of incorporation enumerates three corporate purposes: (1) to aid, promote and encourage schools, facilities, and other organizations that are exclusively educational in character by all appropriate means; (2) to foster the provision of education by the payment of salaries, fellowships and grants to teachers and instructors; (3) to devote all or a part of income from any property, real or personal, to the furtherance and support of projects and institutions that are exclusively educational.
None of these purposes constitute the “moral and mental improvement of men, women and children,” within the meaning of the statute. N.J.S.A. 54:4-3.6 does not contain a general exemption for entities organized for educational purposes. 1711 Third Avenue, Inc. v. Asbury Park City, supra, 16 N.J.Tax at 182. See Secondary School Admissions Test Board, Inc. v. Princeton Bor., 13 N.J.Tax 467, 474-77 (Tax 1993) (entity organized for purposes related to education but not for purposes of operating a school not entitled to a local property tax exemption). “[T]he moral and mental improvement exemption is limited to organizations which directly rather than indirectly seek to uplift the general public morally and mentally.” Id. at 478. See also Church Contribution Trust v. Mendham Bor., 9 N.J.Tax 299, 309 (Tax 1987), aff'd, as modified on other grounds, 224 N.J.Super. 643, 541 A.2d 249 (App.Div.1988) (moral and mental improvement exemption has been applied to nonprofit organizations which directly serve the general public by promoting, making available, and distributing scholarly and scientific materials and information to the general public).
In Secondary School Admissions Test Board, Inc., supra, 13 N.J.Tax at 470, the court rejected the plaintiffs claim to a moral and mental improvement exemption where its certificate of incorporation set forth the corporate purpose as the provision of test programs for use in screening applicants for admission to, and placement in, secondary schools and the latter years of elementary schools, and to furnish educational guidance to such applicants and *570 to carry on research in such matters. Its bylaws stated the corporate purpose to be the provision of “a highly secure, valid, reliable test to be used as one measure for admission to schools and placement in schools. It is committed to providing opportunities for the professional growth of educators in admission. It is committed to serving students, parents and schools.” Ibid. The court concluded that, while the plaintiff had several functions that could be characterized as educational or “uplifting,” those functions were peripheral to the main object of conferring benefits on schools and they were not designed for the moral or mental improvement of men, women, and children. Id. at 479.
Similarly, ISS was organized for the purpose of providing funds and services to schools. The purpose of providing services and funds to other institutions, without more, is not a purpose which qualifies for exemption under N.J.S.A. 54:4-3.6. Cf. Black United Fund v. East Orange City, supra, 17 N.J.Tax at 455 (distributing funds to other organizations that might provide federally tax-exempt services is not an exempt purpose described in N.J.S.A. 54:4-3.6).
III.
Having found that ISS is not organized exclusively for the moral and mental improvement of men, women, and children, it is unnecessary to consider the issue of whether the subject property is actually used for the tax exempt purpose. The parties have devoted considerable time and effort in demonstrating the use of the property and both have presented legal argument regarding the relationship of that use to the moral and mental improvement exemption. Some comment on that use is warranted for the purposes of future guidance. Busik v. Levine, 63 N.J. 351, 363-64, 307 A.2d 571 (1973); Estell Manor City v. Stem, 14 N.J.Tax 394, 419 (Tax 1995); Fort Lee Bor. v. Director, Div. of Taxation, 12 N.J.Tax 299, 310 n. 5 (Tax 1992), aff'd o.b. per curiam, 13 N.J.Tax 323 (App.Div.), certif. denied, 134 N.J. 563, 636 A.2d 521 (1993); West Milford Tp. v. Garfield Recreation Comm., Inc., 194 N.J.Super. 148, 155, 476 A.2d 333 (Law Div.1983).
*571 It is defendant’s principal contention that ISS is using the subject property for its for-profit related entities, ISG and ISS-FIN, and is therefore not eligible for exemption. ISS responds that the activities of ISG and ISSFIN cannot be ascribed to ISS unless the defendant provides some reason to disregard the corporate form and pierce the corporate veil. Two areas of inquiry can be derived from the evidence submitted to the court.
First, the extension of a line of credit by ISS to the for-profit affiliate ISG appears to go beyond the corporate purposes for which ISS was founded. It is also a reach to find that the endorsement of commercial entities for a fee is contemplated by the ISS organizational documents. Even without taking into consideration the activities of the for-profit affiliates, the activities of ISS itself raise questions as to its actual use of the property.
Second, Dr. Nicklas is not only the president of ISS and the president and a trustee of ISF (both organized as nonprofit corporations), he also serves as the president of ISG and the chairman of the board of ISSFIN, both for-profit entities. In their request for a letter ruling, ISS and ISF represented to the IRS that it was not contemplated that any employees of ISG would be shared with either ISF or ISS. If such sharing was required, all shared employees would be compensated by each company in accordance with the amount of time such employees devote to each company. Dr. Nicklas, however, does not receive any separate compensation from any of the entities affiliated with ISS. He is compensated solely by ISS. It is unknown whether any other employees of ISS devote any time to ISG or ISSFIN. Dr. Nicklas testified at his deposition that neither ISF nor ISG have offices separate from that of ISS and that both use the ISS mailing address. ISSFIN does maintain separate offices at the subject property for which it pays rent.
Neither plaintiff nor defendant provided any evidence as to precisely what, if any, duties are performed by Dr. Nicklas for the affiliated for-profit entities ISG and ISSFIN and the affiliated nonprofit ISF. The fact that neither ISG nor ISF occupies any separate space suggests that neither business conducts any real *572 business or that Dr. Nicklas conducts their business in ISS space. If the former is true, then perhaps piercing of the corporate veil and attribution of the for-profit purposes and activities of ISG to ISS is warranted. See, e.g., Coppa v. Director, Div. of Taxation, 8 N.J.Tax 236, 250-252 (Tax 1986) (individual shareholders held liable for use tax on boat held in corporate name, where corporation was a paper corporation that did not undertake the barest minimal business activity). If, on the other hand, Dr. Nicklas is performing some activities on behalf of ISG and ISSFIN in space allocated to ISS, a portion of the space is taxable and ISS has the burden of demonstrating what portion is entitled to exemption.
It is also possible that Dr. Nicklas may walk to the space occupied by ISSFIN and perform whatever duties he has with respect to ISG and ISSFIN. Neither party has provided evidence as to whether or how ISSFIN’s offices are physically separated from those of ISS, or whether Dr. Nicklas has been provided with office space within the leased premises.[3]
Accordingly, even if ISS had been organized exclusively for the purpose of the moral and mental improvement of men, women, and children, I would have been obliged to deny plaintiffs motion for summary judgment on the ground that there are material issues of fact in dispute as to the actual use of the subject property. For the reasons set forth above, however, I have concluded that ISS was not organized exclusively for such purposes and is therefore not eligible for exemption from taxation under N.J.S.A. 54:4-3.6. Plaintiffs motion is denied and defendant’s cross-motion is granted.

 Although it is not entirely clear from the exhibits and the deposition testimony, it appears that at least some overseas teachers and administrators may be directly employed by the domestic foundations rather than the overseas schools themselves.

 At the time Paper Mill Playhouse v. Millburn Tp. was decided, N.J.S.A. 54:4-3.6 required that the subject property be actually and exclusively used for the tax exempt purpose. The statute has since been amended to modify the second part of the test, which now requires only that the properly be actually used for the exempt purpose. L. 1985, c. 395. Secondary School Admissions Test Board, Inc. v. Princeton Bor., 13 N.J.Tax 467, 478 n. 7 (Tax 1993); Planned Parenthood of Bergen County, Inc, v. Hackensack, 12 N.J.Tax 598, 603 n. 2 (Tax 1992), aff'd 14 NJ.Tax 171 (App.Div.1993).

 Although the subject property is made up of four condominium units, the court was not provided with a plan showing the physical layout of the four units or a plan showing the physical location of the various functions performed by ISS at the subject property.