991 A.2d 848 (2010)
412 N.J. Super. 511
INTERNATIONAL SCHOOLS SERVICES, INC., Plaintiff-Appellant,
v.
WEST WINDSOR TOWNSHIP, Defendant-Respondent.
No. A-4911-08T1
Superior Court of New Jersey, Appellate Division.
Telephonically Argued February 25, 2010.
Decided April 20, 2010.
*849 Mark D. Schorr, argued the cause for appellant (Crow & Associates, attorneys, Somerset; Mr. Schorr, on the brief).
Michael J. Herbert, Princeton, argued the cause for respondent (Herbert, Van Ness, Cayci & Goodell, attorneys; Mr. Herbert of counsel and on the brief; Rachel U. Doobrajh, on the brief).
Before Judges AXELRAD, FISHER and SAPP-PETERSON.
The opinion of the court was delivered by
AXELRAD, P.J.A.D.
In this local property tax appeal, we consider whether a non-profit organization whose stated goals include "aiding, promoting and encouraging" educational associations "by all appropriate means" actually used the subject property for the "moral and mental improvement of men, women and children," thereby satisfying the second prong for an exemption under N.J.S.A. 54:4-3.6. We disagree with the Tax court's finding that it did not. However, as we agree that plaintiff has failed to satisfy the third statutory prong that the operation and use of the property must not be conducted for profit, we affirm denial of the exemption.
Plaintiff International Schools Services, Inc. (ISS) challenged property tax assessments for the 2002 and 2003 tax years on office condominium units it owns at 15 Roszel Road in West Windsor Township (the township). The property housed the ISS "home office" staff of about fifty people, of which ten were senior staff who oversaw or supervised the development of the service programs and recruitment at the international schools, and the remaining forty employees were support staff.[1] ISS contended the subject property *850 was exempt pursuant to N.J.S.A. 54:4-3.6 as property actually used in the work of a non-profit corporation organized exclusively for the "moral and mental improvement of men, women and children." Following the township's denial of tax exemption, ISS appealed to the Tax Court.
The court granted summary judgment in favor of the township, determining that ISS was not eligible for exemption based solely on the first prong of the three-prong statutory test for exemption articulated in Paper Mill Playhouse v. Millburn Township., 95 N.J. 503, 506, 472 A.2d 517 (1984), i.e., that a claimant must demonstrate: (1) it is organized exclusively for the moral and mental improvement of men, women and children; (2) the property must be actually used for the tax exempt purpose; and (3) the operation and use of the property must not be conducted for profit. Int'l Sch. Servs., Inc. v. W. Windsor Twp., 21 N.J.Tax 553 (2004), rev'd, 381 N.J.Super. 383, 886 A.2d 204 (App.Div.2005). The court concluded that N.J.S.A. 54:4-3.6 did not contain an exemption for an organization having general educational purposes. Int'l Sch. Servs., supra, 21 N.J.Tax at 569. The court also reviewed ISS' certificate of incorporation and found it merely indicated an intent to provide services and funds to other institutions, and not to directly uplift the general public morally and mentally, thus not entitling it to an exemption under law. Id. at 569-70. The certificate of incorporation stated, in pertinent part, that the purposes of the corporation were:
(1) to aid, promote and encourage, by all appropriate means including gifts of money or other property, or by other means, schools, facilities, and other organizations that are exclusively educational in character, (2) to foster the provision of education by the payment of salaries, fellowships and grants to teachers and instructors, and (3) to devote all or a part of the income and any or all of the principal of any property, real or personal, to the furtherance and support of projects and institutions that are exclusively educational....
We reversed and remanded, holding the moral and mental improvement exemption contained in N.J.S.A. 54:4-3.6 did encompass a general educational purpose. Int'l Sch. Servs., supra, 381 N.J.Super. at 386, 886 A.2d 204. We also concluded that, for summary judgment considerations, the statement of ISS' purpose contained in the certificate of incorporation, supplemented with relevant extrinsic evidence as to the organizer's intentions, "arguably suggests a general public purpose in promoting its ideas" which has as a benefit the "moral and mental improvement of men, women and children," thereby generally meeting the first-prong requirement for exemption from property tax. Id. at 386, 388-89, 886 A.2d 204. We did not address the other prongs.
At trial, on remand, the focus was on the second and third prongs, i.e., whether ISS actually used the property for the tax exempt purpose and whether the operation and use of the property were conducted for profit. During the three-day trial in June 2007, ISS presented the testimony of Daniel Scinto and Dr. John Nicklas, its current and former presidents, respectively;[2] Dr. Roger Hove, ISS' executive vice-president *851 since 2005; and Sandra Logorda, ISS' chief financial officer and treasurer since 2005.[3] John Ezysky, CPA, testified for the township. In a published opinion, the Tax court detailed the testimony and found ISS failed to satisfy the remaining two prongs of the Paper Mill Playhouse test, and entered judgment denying the exemption. Int'l Sch. Servs., Inc. v. W. Windsor Twp., 24 N.J.Tax 453 (2009).
The following testimony and evidence were adduced at trial. As ISS contends the evidence on both prongs was "essentially undisputed" and it "do[es] not question the tax judge's findings of fact," but only argues the judge's application of the law to the facts was erroneous, for ease of reference we will intermittently cite to pertinent portions of the court's factual recitation where it summarizes our review of the record.
In 2002 and 2003, ISS was a § 501(c)(3) tax exempt corporation. It was founded in 1955 "to serve American international schools overseas," initially providing teachers for the schools. Dr. Nicklas testified that during 2002 and 2003, ISS' mission was to "promote, by all means possible, support of schools around the world that provided an education for Americans" and those requiring an American-style education. Id. at 459. All of the schools served by ISS provided American-style education in English. ISS decided the services it would offer based on the needs of the schools gleaned from a periodic survey and conversations with the schools. According to Dr. Nicklas, at that time ISS provided services to as many as 800 schools, with 150 to 300 schools using all of ISS' services or a large portion of them. The schools served by ISS were primarily non-profit, nondenominational, independent schools, located in 180 to 185 countries around the world, generally organized by a group of parents and supported by various organizations employing the students' parents in the communities where the schools were located. Ibid. About twenty-five to thirty percent of the students in the schools were American nationals. Ibid. Tuition was paid directly by parents or, in some instances, by their corporate employers. Ibid.
According to Dr. Nicklas, ISS was best known at the time for providing educational staff. In his view, ISS provided and selected the best American teachers and superintendents for the schools by running a series of recruitment fairs in the United States, maintaining a database of 1300 to 2000 individuals qualified to staff the international schools, providing information about the schools and ISS' services on its website, advertising for candidates in educational magazines and newspapers, and conducting initial screenings of candidates for the schools. Id. at 460. Dr. Nicklas testified that through its staffing service program ISS placed about 700 teachers in the international schools each year.
ISS also provided services to various businesses to manage schools for the dependents of their employees, performing all the functions of an American school system. Ibid. According to Dr. Nicklas, ISS had five to fifteen contracts to provide school management services in any given year. Id. at 461.
Another major ISS program was the procurement of school supplies for the international schools, which ISS purchased at a discount it passed along to the schools, temporarily storing the supplies at the West Windsor property. Ibid. Dr. Nicklas emphasized that the better quality of educational materials available to the students, *852 the better opportunities a teacher had to provide a good education. Ibid.
ISS also provided assistance in financial management to the schools and their foundations. It assisted in creating and processing governmental filings to maintain the foundations, thereby aiding schools in attracting qualified teachers. Id. at 462. ISS also handled cash management functions, processing of payroll and salaries, and procurement, administration and processing of insurance and health plans. Ibid. ISS charged the schools on a fee for services basis. Ibid.
ISS began a program of owning and managing international schools. In 2002, it entered into an agreement to purchase, through a subsidiary, a school in the Cayman Islands, and, subsequent to the subject tax period, acquired four more schools. Id. at 464-65. Dr. Nicklas explained that this program was initiated in response to the request of communities for a qualified or good American school to satisfy the educational needs of dependents of American personnel.
Dr. Nicklas testified about individual grants that ISS made to students and schools but based on the lack of supporting evidence, the judge found the only grants ISS made during the subject period were for speaker fees for appearances at conferences devoted to the professional development of the international schools' faculty. Id. at 464.
ISS also published the Directory of Schools, describing the educational programs of about 600 schools, which, according to Dr. Nicklas, was "very used and desired by parents who were going to be stationed by their companies and missionaries and governments in various places around the world" and to educators in deciding where they would like to teach. It also published a quarterly newsletter, which Dr. Nicklas described as a news link or way for the schools to learn about other schools and to advertise for teachers they would like to hire, as well as for teachers to keep in touch and share ideas, noting that many were in locations that were very isolated. Id. at 463. Dr. Nicklas elaborated upon how the publications assisted, encouraged and promoted the schools that ISS serviced as follows:
By providing information that parents and teachers needed to determine that there was a good educational program available before they made a commitment to be assigned somewhere. By providing information to the teachers about those schools also before they made a commitment to work there. And by providing information about one another through the newsletter, about their colleagues and friends, about what they were doing with different teaching methods and different curriculum and different programs and field trips and so forth.
Although ISS sold advertising that was carried in the Directory, the publication was provided free to all of the schools and to the teaching candidates. Ibid. Dr. Nicklas testified that the newsletter, which was also free, was "circulated widely" to every international school and anyone who requested it.
ISS also maintained a website, which provided information about ISS and its services, the international schools and the teaching positions that were available. Ibid. Teachers could submit applications online. The ISS website as of June 11, 2003, explained ISS' services as follows:
The Princeton [mailing address for West Windsor property] office of ISS is staffed by professionals experienced in the field of international education. ISS also employs teachers and administrators in the schools it operates worldwide. ISS services include establishing and operating *853 international schools, recruiting and placing teachers and administrators, consulting, financial management, purchasing and shipping instructional materials, supplies, and equipment for schools, colleges, and universities, publishing, foundations management, and facility planning.
The website at that time explained ISS' mission as follows:
The mission of [ISS] is to advance the quality of education for children in international schools by providing innovative services and solutions for learning communities and corporations throughout the world. This is accomplished by working with all groups that are involved in the education process.
According to Dr. Nicklas, ISS would also circulate a list of its services and send other information to regional associations, such as The African Association, and regional newspapers around the world, so organizations would be apprised of the services it performed.
Dr. Nicklas also testified about ISS' response in the late 1990s to the additional needs of its schools for services related to better health benefits and retirement plans for the staff and in obtaining capital to develop school buildings. Initially, ISS formed alliances with for-profit providers of services that were marketed to the international schools and, in fact, ISS received between $50,000 and $75,000 in endorsement fees from a provider, Insurance Services International, of which $50,000 was received in 2002. Id. at 467.
Dr. Nicklas then explained that when ISS learned that such alliances might jeopardize its § 501(c)(3) status, with the assistance of professionals, ISS set up a structure to permit it to partner with for-profit organizations to provide services to international schools while maintaining its federal tax-exempt status. International Schools Foundation (ISF) was formed in 1999 as a New Jersey non-profit corporation, effectively operating as the umbrella organization of ISS and a New Jersey for-profit corporation called Independent School Group, Inc. (ISG). According to its certificate of incorporation, ISG was formed for the purpose of "establishing partnerships with other for-profit organizations, capital development, cash management, and the administration of individual retirement plans." Ibid.
In addition to serving as president of ISS and a board member of ISS and ISF, Dr. Nicklas served as president and chairman of the board of ISG in 2002-2003, thereby being involved with both the non-profit and profit-making organizations. Dr. Nicklas testified that he assisted in setting up meetings and "promot[ed] services" on ISG's behalf. Id. at 469 (alteration in original). He received no separate compensation from ISG or ISF. Ibid. Logorda, who was ISS' director of accounting during the subject time period, also testified that as part of her job responsibilities she offered assistance as necessary to the for-profit affiliates, ISG and ISS Financial and Insurance Network, Inc. (ISSFIN), infra, without additional compensation.
Around April 2003, ISG and Gables Financial Group (GFG), both profit-making organizations, formed the for-profit entity called ISSFIN, of which ISG had a fifty-one percent ownership interest and GFG had the remaining forty-nine percent interest. Id. at 470. The press release, however, bore the heading "ISS & GFG Announce Formation of Financial and Insurance Network" and provided that the two entities had formed the partnership known as ISSFIN, a "financial and insurance services organization" to be headquartered in Coral Gables, with a regional sales and marketing office at ISS' headquarters in Princeton. It further quoted *854 Dr. Nicklas, identified as ISS' president, as stating that "[i]t was simply a matter of finding partners and personnel with the right experience and vision as ISS." The press release further provided:
[ISSFIN] will serve the market with a full slate of insurance products and services for teachers and administrators, including medical, life, and disability products, as well as various business and liability coverages for the international schools. In addition, [ISSFIN] is currently marketing products for individual financial security through a strategic partnership with Raymond James Financial, and has entered negotiations for a strategic alliance to provide capitalization products for schools.
ISS was formed in 1955 to serve the interests of the international school community, and provides personnel recruiting, operations management, and purchasing services to schools, foundations and other teaching facilities (such as hospitals). John M. Nicklas says, "Providing financial and insurance products is a natural extension of our original mission."
One of the contact persons listed was identified by Dr. Nicklas as a consultant for ISG, but the telephone number given was one listed by ISS on its letterhead for its headquarters at the subject property. Id. at 471.
ISS' financial statements disclosed that it provided start-up funding for both ISF and ISG, and in January 2000, ISS extended to ISG a $100,000 unsecured line of credit to provide it operating capital, payable at prime plus one percent, which it increased to $400,000 as of September 2003. Id. at 469. ISS' financial statements reflected that as of June 30, 2000, ISG owed it $49,247, and as of June 30, 2003, ISG's debt had increased to $318,965. Ibid. ISG made some interest payments on account; however, ISS' financial statements for the fiscal year ending June 30, 2003 do not reflect that ISG had paid the principal amount of the loan that was originally due in January 2003. Ibid. The township's accountant testified that ISG's tax returns reflected losses in 2000-2002 totaling $274,990, which were financed through loans from ISS.
Logorda testified, with reference to a floor plan and chart, about the physical layout of the space used by ISS and its affiliated entities. Approximately 600 square feet was dedicated to ISG and approximately 1400 square feet was dedicated to ISSFIN. ISG's November 14, 2000 lease reflected a rent of "$500.00 per month, inclusive of utilities," with ISG also responsible for "phone, fax, cable, and e-mail charges." The lease document contained no reference to which entity would pay taxes or insurance. Logorda testified that ISG ceased paying rent in August 2001 because its CEO was terminated, so there was no one actually occupying the space. ISS used the area primarily for storage. During the tax years in issue, however, ISG did continue to have the office space dedicated to it and used the address as its official one, as reflected on its 2002 federal tax return.
Logorda testified that ISSFIN's space was occupied by four staff members. The ISSFIN lease document contained the same language as the ISG lease, requiring a rental of "$700.00 per month, inclusive of utilities," with ISSFIN also responsible for "phone, fax, cable, and e-mail charges." Again, there was no reference to which entity would pay taxes or insurance. Although Logorda initially testified that the rental was fair market value for the space, when confronted with the annual statements of income and expenses for the 2003 and 2004 calendar years that had been filed with the township assessor (commonly *855 referred to as "Chapter 91," N.J.S.A. 54:4-34), she conceded otherwise. The schedule indicated that the space was leased to ISSFIN beginning in 2003 on a gross rental basis, i.e., the landlord pays all operating expenses, at a rate of $6/square foot. According to the schedule, all other tenants were on a shared rental basis, which Logorda explained as ISS and the tenant sharing expenses, at rates ranging from $20 to $23.10/square foot. Id. at 474. Logorda thus conceded that, based on ISS' submissions to the township, ISSFIN was being charged about a third to a quarter of what was being charged to other tenants and was not paying for insurance, taxes and utilities in contrast to all the other tenants.
ISS' audited financial statements for the fiscal years ending June 1998 through 2003 reflected that its principal programs consistently operated at a profit, although ISS frequently experienced substantial overall net losses from operations. Id. at 465. Logorda testified that ISS had approximate net losses of about $200,000 in 2002, $40,000 in 2003, and $475,000 in 2004. The Tax court's prior opinion had concluded that the losses were a consequence of relatively large general and administrative expenses. Ibid. (citing Int'l Sch. Servs., supra, 21 N.J.Tax at 563).
Based on the aforementioned testimony and evidence, the Tax court found that "[t]here is no question that ISS provides valuable services to international schools," noting it "aids and encourages the international schools it serves[,]" and "serves the practical needs of those schools, making available teachers and administrative staff, procuring school supplies, and managing their ordinary and extraordinary business needs." Id. at 478. Nevertheless, the court concluded that such services "are not in the nature of important public services of the type that have been found eligible for the moral and mental improvement exemption" because there was "virtually no evidence" suggesting ISS promoted its goals among the "public at large or that ISS educated the general public about its purposes and concerns." Ibid. The only evidence the court found of service to the general public was ISS' newsletter, which it concluded was a "relatively minor function performed by ISS" based on the nominal amount of operating revenue derived and expenses attributable to the publications for the tax years at issue, further noting the absence of testimony regarding the amount of space occupied by ISS in the subject property devoted to that activity. Ibid. The court was of the opinion that ISS' activities merely benefited the international schools and enabled them to provide an enhanced education but that ISS' activities did not directly uplift the general public and, as such, the second Paper Mill Playhouse prong was not met. Id. at 476-80.
ISS challenges that ruling, contending the court took too narrow a view of the term "public purpose," not warranted by the Legislature or case law, when it suggested the qualification for the exemption somehow turned on whether ISS "educated the general public about its purposes and concerns" and performed the services directly for the public as opposed to indirectly through the school. ISS further urges the court improperly applied the statute when it found ISS' activities did not serve a general educational purpose because they only affected a segment of the public"providing services to the schools, their faculty, and through their publications, to the parents of potential students." Id. at 478, 480. We agree with ISS.
We are mindful that statutes granting exemptions are to be strictly construed against the claimant and that the *856 entity claiming exemption has the burden of establishing its entitlement to the exemption. Princeton Univ. Press v. Borough of Princeton, 35 N.J. 209, 214, 172 A.2d 420 (1961); Essex Props. Urban Renewal Assocs., Inc. v. City of Newark, 20 N.J.Tax 360, 365 (2002). The construction, while strict, however, must be reasonable. Princeton Twp. v. Tenacre Found., 69 N.J.Super. 559, 563, 174 A.2d 601 (App.Div.1961). The rule of strict construction must not defeat the evident legislative design. Ibid.
The unrebutted evidence is that during the tax years at issue the subject property housed the ISS "home office" staff of about fifty people, comprised of senior staff who were experienced in the field of international education and who oversaw or supervised the development of the service programs and recruitment at the international schools, as well as support staff. ISS established and operated schools and furnished a multitude of school management services for five to fifteen corporations a year, providing an American-style education in 180 to 185 countries around the world. Its services included assisting in faculty planning and recruiting and placing teachers and administrators; procuring the best school supplies, instructional materials and educational equipment at negotiated quantity discounts passed along to the schools, which were temporarily stored at the subject property and then consolidated for shipping to each school so the supplies arrived in a timely manner for the opening of the school year; providing a myriad of financial and foundation management services that permitted the schools to attract qualified educators; in short, satisfying every need a domestic board of education fills. In addition, as testified to by Dr. Nicklas, ISS' Directory of Schools and quarterly newsletters, produced and provided without charge, served the mission of ISS by providing information to parents and teachers so they could determine whether there was a good education program before committing to be assigned to a specific geographic location, and the newsletter provided information to teachers about their colleagues and friends and about teaching methods and curricula used by others. ISS also maintained a website and advertised its services and recruitment needs in international publications.
In our earlier opinion, we held that ISS' certificate of incorporation appeared to evidence an exempt general public purpose in its stated goal of "aiding, promoting and encouraging" educational associations "by all appropriate means" and left to the trial court on remand whether ISS actually accomplished that goal. Int'l Sch. Servs., supra, 381 N.J.Super. at 388, 886 A.2d 204. The array of services provided by ISS helps improve the quality of education at international schools and provides a direct benefitmoral and mental improvementto the students themselves, their families and their employers, as well as to the educators. We disagree with the Tax judge's conclusion that such recipients were insufficient to qualify for the public service exemption. A property may qualify for the exemption without direct proof that the claimant's activities improve any particular individuals morally or mentally. See Chester Theatre Group v. Borough of Chester, 115 N.J.Super. 360, 365, 279 A.2d 878 (App.Div.1971) (granting an exemption to a theater organization that presented dramatic offerings and music recitals). It cannot be said that theatre performances reach the public at large; they only reach those specifically interested in attending. Likewise, an organization such as ISS that promotes education by assisting international schools, corporations, *857 teachers and parents will directly reach only those interested entities and individuals.
We also note that encouraging independent schools providing quality American-style education worldwide and disseminating information about the programs through publications has the added benefits of attracting people to countries to which they might not otherwise relocate and making institutions available throughout the world where values such as democracy and independent thinking are taught. Accordingly, we are satisfied the testimony overwhelmingly demonstrates that ISS fulfilled its legitimate public purpose goals and that the activities are conducted by its trained staff at the subject property.
That ISS provided the services to the schools and not directly to the public is not fatal to its qualification on this prong. See Princeton Univ. Press, supra, 35 N.J. at 216, 172 A.2d 420. The purposes of the non-profit Press were "in the interests of Princeton University, to establish, maintain and operate a printing and publishing plant, for the promotion of education and scholarship," and its services included operating a printing plant, publishing a periodical that reported on alumni and assisted University fundraising, and selecting, printing and distributing scholarly works. Id. at 211-12, 172 A.2d 420. Our Supreme Court found these services unquestionably served the moral and mental improvement of men, women and children and served a "valuable public service." Id. at 216, 172 A.2d 420. Ultimately, however, the Court found the Press was ineligible for an exemption because it undertook certain printing to make a profit. Id. at 216-17, 172 A.2d 420. ISS' activities similarly advance the educational mission of American-style international schools by providing services that improve the quality of their education and serve the valuable public purpose of assisting in the education of American students and other foreign nationals abroad.
We turn now to the third prong necessary for an exemption. N.J.S.A. 54:4-3.6 requires, in pertinent part, that the properties for which exemption is claimed:
are not conducted for profit, except that the exemption of the buildings and lands used for charitable, benevolent or religious purposes shall extend to cases where the charitable, benevolent or religious work therein carried on is supported partly by fees and charges received from or on behalf of beneficiaries using or occupying the buildings; provided the building is wholly controlled by and the entire income therefrom is used for said charitable, benevolent or religious purposes.
The court found ISS operated and maintained the subject property for the purpose of making a profit, as that requirement has been construed in the case law. Int'l Sch. Servs., supra, 24 N.J.Tax at 480. The court found no evidence of excessive salaries paid by ISS. Id. at 482. However, the court found there to be substantial credible evidence in the record demonstrating that ISS was able to, and did, subsidize its related for-profit entities, ISG and ISSFIN, by activities conducted out of or by persons working at the subject property. Ibid. The court noted, for example, that ISS provided space to ISSFIN and ISG at the subject property at rentals substantially below rates charged to other tenants ($10/square foot for ISG and $6/square foot for ISSFIN as contrasted with $20 to $23.10/square foot) and paid all operating expenses for the space (insurance, tax and utility charges) except for telephone and fax charges, while the leases of other tenants were on a shared rental basis. Ibid. In fact, as the court noted, on cross-examination Logorda conceded *858 the likelihood that the related entities were being subsidized. Ibid. The court concluded the funds for the subsidy either came from: "(1) ISS's operating income, which ... would otherwise have been applied to the purposes for which exemption was claimed, or to surplus for eventual use in conducting those same activities; or (2) from ISS surplus itself." Ibid.
The court also found the credit line to ISG came from ISS' operations or surplus and was provided to a related entity organized specifically for the purpose of making a profit. Id. at 483. Although ISS urged that this was just another investment, the court noted that it was "an unsecured loan to a new entity that produced little income," was consistently increased, and was a substantially different type of investment than the rest of ISS' surplus as reflected on its tax returns for that period, namely, solid corporate stocks and bonds and U.S. Treasury notes. Ibid. Moreover, ISS' June 30, 2003 financial statement does not reflect payment of the principal amount of the loan that was originally due in January 2003.
ISS also utilized its profits to fund ISG and ISSFIN by providing services to them without any evidence that such services were "charged back" to the profit-making entities. Id. at 482. For example, the entities received, without charge, the benefit of Dr. Nicklas' and Logorda's services, the staff at ISS provided start-up accounting services for ISG and continued to maintain its books and records, and ISG's and ISSFIN's federal tax returns for the subject period were prepared by a certified public accountant employed by ISS. The court also noted that an additional ultimate recipient of ISS' funds was another for-profit entity, GFG, which was ISG's partner in ISSFIN. Ibid.
Lastly, the court concluded that "ISS intended to use its name to promote the joint profit-making ventures" as evidenced by the press release by ISS and GFG announcing the formation of ISSFIN, which Dr. Nicklas himself conceded could be construed as announcing that ISS was entering into a partnership with a profit-making entity, and the promotion of ISSFIN on its website. Id. at 483.
ISS challenges the court's ruling on the third prong, arguing it did not operate on the property for the purpose of making a profit. ISS submits it proved its mission was education, not profit, and that it never priced its services or professional salary structure like a commercial enterprise. It further argues the court did not apply either the narrower focus of the Supreme Court in Paper Mill Playhouse, supra, i.e., "a pragmatic inquiry into profitability," which involves a "realistic common sense analysis of the actual operation of the taxpayer," 95 N.J. at 521, 472 A.2d 517, or the multifaceted analysis of The Kimberley School v. Town of Montclair, 2 N.J. 28, 37-38, 65 A.2d 500 (1949),[4] to determine whether or not the school is "conducted for the purpose of making a profit." ISS contends that instead the court improperly dwelled on a single factorhow ISS deployed its reserve in connection with what it considers to be "incidental activities" *859 unrelated to its educational mission. Moreover, according to ISS, its below-market lease arrangement with ISG or ISSFIN has no bearing on ISS' eligibility for an exemption for the space it occupies because N.J.S.A. 54:4-3.6 no longer requires "exclusive" use of the property for the tax-exempt purpose. See Jersey Shore Med. Ctr. v. Neptune Twp., 14 N.J.Tax 49, 66, 71 (1994) (where hospital coffee shop operated as a for-profit entity, exemption was lost only for that section in which the coffee shop operated).
We are not persuaded by these arguments and affirm the court's ruling finding ineligibility on the third prong substantially for the comprehensive reasons articulated in its published opinion. The court was well aware of the 1985 amendment, L. 1985, c. 395, that deleted the word "exclusive" and now requires only that the property be "actually" used for the exempt purpose. Int'l Sch. Servs., supra, 24 N.J.Tax at 480-81. Contrary to ISS' assertion, we are also satisfied the Tax judge appropriately performed a "pragmatic inquiry," with "a realistic common sense analysis" of ISS' "actual operation[s]," Paper Mill Playhouse, supra, 95 N.J. at 521, 472 A.2d 517, and based the determination on this prong on substantial credible evidence. The judge had ample basis in the record to conclude that a portion of ISS' profit was being used to subsidize the operations of its profit-making affiliates through the provision of professional services that were not "charged back," below-market rents, and unsecured loans that do not appear to have been timely repaid. In addition, although ISS has an educational mission, it has lent its name and reputation to promote joint profit-making ventures, as evidenced, in part, by its creation of ISG and ISSFIN, which operate out of the same building as ISS and share officers and staff; the wording of the ISSFIN press release; and the expanded mission statement on ISS' website promoting "ISSFIN['s] ... money and asset management products."
Affirmed.
NOTES
[1] ISS leases some of its space to unrelated for-profit organizations for which it does not claim an exemption. ISS and the township have agreed upon that portion of the space subject to taxation. ISS also does not claim an exemption for portions of the property dedicated to its related for-profit organizations, Independent School Group, Inc. (ISG) and ISS Financial and Insurance Network, Inc. (ISSFIN), consisting of approximately 600 feet and 1400 feet, respectively. It claims it is entitled to an exemption on the remainder of the property.
[2] Nicklas was ISS' president during the tax years at issue and Scinto was its executive vice-president and treasurer.
[3] Logorda was director of accounting from 2002 through 2005.
[4] In assessing whether an organization's charges "are fixed with the obvious intention of yielding a profit," the organization needs to be viewed as a whole, with regard to the interplay of the following factors: the background and nature of the organization; the character and membership of its governing body; the amount of its income as compared with its costs of operation; the amount of any excess income over costs, and the actual and possible use of such excess; the existence and amount of its surplus and the use to which it is put; and the organization's salary scale. The Kimberley School, supra, 2 N.J. at 37-38, 65 A.2d 500.