MENYUK, J.T.C.
This is the court’s decision following trial of these actions, which contest omitted added assessments for the full twelve months of tax year 2002 and omitted assessments for the full twelve months of tax year 2003 on four office condominium units located at 15 Roszel Road in the defendant municipality. Plaintiff contends that the subject property is exempt pursuant to N.J.S.A. 54:4-3.6 as property actually used in the work of an association or corporation organized exclusively for the moral and mental improvement of men, women, and children. As described in more detail below, plaintiff International Schools Services, Inc. (“plaintiff” or “ISS”), *456 is the business or management arm of schools located outside the United States that serve expatriate American students as well as foreign nationals.
These actions were previously the subject of cross-motions for summary judgment. In a published decision, International Schools Services, Inc. v. Township of West Windsor, 21 N.J.Tax 553 (Tax 2004), rev’d, 22 N.J.Tax 659 (App.Div.2005), the Tax Court determined that ISS was not eligible for exemption, 21 N.J.Tax at 569-70, based solely on the first prong of the three-prong statutory test for the exemption set forth in Paper Mill Playhouse v. Township of Millburn, 95 N.J. 503, 506, 472 A.2d 517 (1984), namely, that a claimant must demonstrate that: (1) it is organized exclusively for the moral and mental improvement of men, women and children; (2) the subject property must actually be used for the tax exempt purpose; and (3) the operation and use of its property must not be conducted for profit.
The ISS certificate of incorporation provided, in pertinent part, that the purposes of the corporation were: “(1) to aid, promote and encourage, by all appropriate means including gifts of money or other property, or by other means, schools, facilities, and other organizations that are exclusively educational in character, (2) to foster the provision of education by the payment of salaries, fellowships and grants to teachers and instructors, and (3) to devote all or a part of the income and any or all of the principal of any property, real or personal, to the furtherance and support of projects and institutions that are exclusively educational....” This court concluded that N.J.S.A. 54:4-3.6 did not encompass an exemption for an organization having general educational purposes, and found that the plaintiff’s organizational documents indicated only an intent to provide funds and services to other institutions and not to directly uplift the general public morally and mentally. International Schs. Servs., Inc., supra, 21 N.J.Tax at 569-70.
The Appellate Division reversed and remanded, holding that the moral and mental improvement exemption contained in N.J.S.A. 54:4-3.6 did encompass a general educational purpose. Interna *457 tional Schs. Servs. v. West Windsor, 22 N.J.Tax at 663. It also found that the Tax Court’s reading of plaintiff’s certificate of incorporation was too narrow. The Appellate Division determined that plaintiffs certificate of incorporation as supplemented by a statement from plaintiffs president as to the circumstances under which plaintiff was formed evidenced a purpose broader than simply providing services and funds to overseas schools. Rather, it “suggestLed] a general intent to promote its activities among the public in general which has, as a benefit, the ‘moral and mental improvement of men, women and children.’ ” Id, at 662. The Appellate Division concluded that the purpose of aiding, promoting, and encouraging educational organizations by all appropriate means, was included within the “moral and mental improvement” exemption, but “[wjhether [ISS] has actually done so is an issue to be resolved through the application of the facts to the second prong of the Paper Mill Playhouse test____” Id. at 664.
Although the defendant municipality argues that the Appellate Division decision permits me to find otherwise, I read that decision as clearly holding that the organizational documents, read together with the statement of the founder’s purpose, adequately demonstrates that the plaintiff was organized exclusively to promote the moral and mental improvement of men, women, and children. The issue before the court on remand is therefore limited to whether plaintiff has satisfied the remaining two prongs of that test: whether the subject property was actually used for the tax exempt purpose; and whether the operation and use of the property were conducted for profit.[2]
I note at the outset that determinations as to eligibility for exemption are made as of October 1 of the pretax year, which, in this case was October 1, 2001 (for 2002) and October 1, 2002 (for 2003). See Presbyterian Home at Pennington v. Borough of Pennington, 23 N.J.Tax 473, 490 (Tax 2007), appeal docketed, *458 Docket No. A6061-06T1 (App.Div. July 27, 2007) and eases cited therein. Testimony was generally elicited for the period for which the assessments were made-the calendar years 2002 and 2003-rather than the October 1, 2001 and October 1, 2002 valuation dates. However, nothing in the testimony indicated that the state of facts as of October 1, 2001 differed substantially from the state of facts as of January 1, 2002. Except where documents (such as tax returns, financial statements, and leases) or specific testimony enabled the court to fix an activity or occurrence on a particular date or during a specific time period, I have assumed that the testimony regarding the activities of ISS during the tax years in issue also describes the activities as of October 1 of each pretax year. Because ISS has the burden of establishing its entitlement to the exemption, Princeton University Press v. Borough of Princeton, 35 N.J. 209, 214, 172 A.2d 420 (1961), the assumption will be favorable to it to the extent that the evidence confirms that the subject property was actually used for a tax exempt purpose and that the operation and use of the property were not conducted for profit during the tax years in issue. If the evidence tends to show the contrary, obviously it will not benefit the plaintiff. Because of the burden of proof, however, ISS cannot establish its entitlement to exemption for tax year 2002 unless that assumption is made. For the following reasons, I conclude that ISS has failed to satisfy the remaining two prongs of the Paper Mill Playhouse test.
According to John Nicklas, now retired, but who was plaintiffs president during the tax years in issue here,[3] ISS was founded in 1955[4] by a former war correspondent who was interested in world peace and in supporting the education of American dependents *459 abroad. The organization began by providing teachers for international schools.
Dr. Nicklas testified that during 2002 and 2003, the mission of ISS was to promote, by all means possible, support of schools around the world that provided an education for Americans and other dependents that required an Ameriean-style education. The schools served by ISS were, in general, non-profit, nondenominational, independent schools, generally organized by a group of parents. The schools were supported by various organizations employing the students’ parents in the communities where the schools were located, and were governed by boards of directors that were usually elected. The schools varied in size from as small as three or four students to as large as 1000 or more students. The schools offered what Dr. Nicklas called an American-based education conducted in the English language for the most part. The educational programs were modeled after schools in the United States and taught American values such as democracy and independent thinking, and prepared students for further education at a university or college in the United States.
During 2002 and 2003, these schools were located in 180 to 185 countries around the world. The students were expatriates from many countries. The largest group was American, but Dr. Nicklas testified that the percentage of American students had been shrinking over the years beeáuse multinational corporations had been hiring increasing numbers of international employees. Dr. Nicklas estimated that, during the years in issue, twenty-five to thirty percent of the students in the schools served by ISS were American nationals. The teaching staff was over fifty percent American, because that staffing made it easier to design, implement, and maintain the American curriculum. The balance of the staff was generally from other English speaking countries. Roger Hove, the executive vice president of ISS since June 2005, and an administrator at international schools for more than twenty years, testified that, in his experience, tuition for students was paid directly by parents and sometimes by the corporations that employed the parents.
*460 Dr. Nicklas testified that the services provided by ISS evolved over time and were based on the needs of the schools as determined by ISS through periodic surveys and by speaking with the schools. When asked how ISS fulfilled its mission in 2002 and 2003, Dr. Nicklas responded that the organization was best known for its staffing services, that is, providing educational staff for the schools.
Dr. Nicklas described the staffing program as follows. ISS recruited teachers and maintained a database of between 1300 and 2000 teacher candidates. It charged fees of $100 to $150 for setting up a teacher’s credentials file. ISS ran a series of recruitment fairs in the United States where superintendents (senior officers) and principals of international schools could meet and select teachers for their schools. Teacher candidates were charged an additional fee of $300 to $350 to attend a series of recruitment fairs. Schools were charged fees to gain access to plaintiffs candidate pool. ISS also conducted searches for the position of school superintendent. It maintained a database of potential superintendent candidates and would advertise for additional candidates in education magazines and newspapers in the United States. ISS would conduct an initial screening and select a group of candidates and send their dossiers to the local board for review. The board would select three candidates to bring to its campus to interview. Dr. Nicklas testified that, in his view, ISS’s staffing program promoted, aided and encouraged educational institutions by selecting the best American educators and providing the schools with the opportunity to have those persons work at their schools, teaching their students.
ISS also provided schools management services. ISS was hired by contract with various businesses, including petroleum companies such as BP, Amoco, and Arco, and others, such as Lockheed Martin and Union Carbide, to manage a school. In that capacity, ISS did everything that a school system in the United States would do, namely, provide an American-style, English language education to the dependents of the company’s employees. ISS would hire the superintendent, and with the superintendent’s assistance, hire teachers. It would then buy the materials and ship them out to the school. ISS would also set up a central office *461 system so that the staff could be paid and receive benefits. According to Dr. Nicklas, in any given year, it had five to fifteen contracts to manage a school. He testified that the schools management function fulfilled the mission of ISS because it provided an education to the dependents of people who worked for the companies with which it contracted equivalent to what those students would have received in the United States.
Another major ISS program was the procurement of school supplies. ISS sent the catalogs of various suppliers to the schools each year. Each school decided what materials it needed for the coming year and sent its order to ISS, which made the purchases, negotiated quantity discounts (which were passed along to the schools), temporarily stored the purchases at the subject property, and then consolidated the material for shipment to each school so that the supplies arrived in a timely manner for the opening of the school year. Dr. Nicklas testified that this activity promotes, encourages and aids international schools because the better the educational materials that children have, the better the opportunity for a teacher to provide a good education. He also stated that, without ISS’s assistance, it would be more expensive for the schools to purchase the materials directly, and it would be difficult if not impossible for the schools to obtain the same materials themselves because of various rules, regulations, and tax laws governing the import of such materials.
ISS also provided foundation management services. As described on the ISS website during the period in issue here, and as elaborated upon by Dr. Nicklas in his deposition[5] **and trial testimony, school foundations are set up to perform two functions. First, a foundation set up for a particular school accepts donations and grants on behalf of that school to be used in the educational program.[6] The second function is to set up and support all the *462 back office operations of the school, such as payroll, retirement plans, and insurance plans.
The ISS website stated that ISS recommends legal counsel to assist in the creation of the foundation and that, later, ISS will process any governmental filings necessary to maintain the foundation’s status. ISS performs cash management functions if the school requests it. It will assist the school in obtaining pension, health, life and other insurance plans, and once the plans are established, ISS will handle the administration of and enrollment in and termination of those plans, assist with claim processing, and so forth. It will maintain a general ledger for the foundation and act as the United States-based payroll agent for the school. ISS charges fees on a fee for services basis and fees vary depending upon the scope of services provided.
Dr. Nieklas testified that a foundation and the services performed by ISS for that foundation enable the educational staff to get their salaries in dollars or whatever currency they direct. It also enables the staff to obtain portable retirement and health benefits and bring those benefits to another school. Dr. Nieklas stated that by performing these functions, ISS permits schools to attract qualified teachers and permits teachers to have the benefits they need so that they can focus and concentrate on teaching.
Daniel Scinto, the executive vice president and treasurer of ISS during the tax years in issue and its president at the time of trial, testified that each of ISS’s programs determines its prices separately, but that all of ISS’s services were priced based on the ability of a school to pay. According to Mr. Scinto, fees were based on a matrix which took into account the size of the school, the risk of the area where the school was located, and the difficulty of the work involved. Mr. Scinto testified that ISS would occasionally deviate from the matrix if, for example, a school was having difficulty in being able to pay for services. Mr. Scinto indicated that ISS had some competitors, particularly in the field of teacher placement services. Some of its competitors were not-for-profit and others were for-profit organizations. Mi’. Scinto *463 believed that the various organizations providing teacher placement services charged competitive fees.
ISS produces two publications, a directory of schools and a newsletter. During the time period in issue, the directory listed about six hundred schools and described their educational programs. The directory was used by parents who were going to be stationed abroad (either by their companies, their governments, or as missionaries), and by teachers recruited by ISS to obtain basic information on the schools and to locate areas where they might wish to teach. Mr. Scinto testified that ISS sold advertising that was carried in the directories, but the directory itself was given without charge to all of the schools and to teaching candidates.
The newsletter was produced four times a year. Dr. Nicklas described it as a news link, a way for the schools to learn about other schools, and to get information about and advertise for teachers. Dr. Nicklas explained that the teachers in some of the locations were very isolated, and in the days before e-mail, it was difficult for them to exchange information with other people who were engaged in the same work around the world. The newsletter was circulated without charge to every international school and to anyone who wanted to be on the mailing list. According to Dr. Nicklas, the directory and newsletters served the mission of ISS by providing information to parents and teachers so that they could determine whether there was a good education program before committing to be assigned to a specific geographic location. The newsletter provided information to teachers about their colleagues and friends, and about teaching methods and currículums used by others.
In 2002-2003 (and to date), ISS also maintained a website. At that time, the website was beginning to serve the same purpose as the newsletter, that is, providing information about ISS, about teachers that were available, and about the international schools. The website promotes ISS’s services, and teachers can begin the application process through the website.
Dr. Nicklas testified that, during the period in issue, ISS made grants totaling about $150,000 during 2002 and 2003 to regional *464 associations of international schools so that the associations could provide educational training at their conferences. He also testified that ISS made grants to individual teachers or schools totaling about $40,000. He stated that the purpose of the 'gi’ants was to permit teachers to be innovative and to have teachers and schools develop educational programs and to communicate those programs to others. Apart from that general statement, there was no testimony as to the identity of the persons or school to whom gi’ants were made or the specific purpose or purposes of those grants.
Dr. Nieklas stated that ISS made such grants every year and that the grants financed programs that promoted international and American style education. As conceded by Dr. Nieklas on cross-examination, however, no such grants were listed on ISS’s Form 990 (federal return of organization exempt from tax) for the period July 1, 2001 through June 30, 2002, although the form plainly called for information about grants and allocations made by ISS. According to Mr. Scinto, the gi’ants were reflected somewhere in the financial statements but he could not say where. Sandra Logorda, the chief financial officer and board treasurer at the time of trial and director of accounting for ISS during the time period in issue, testified that the grants made by ISS were essentially speaker fees for sessions devoted to promoting professional development at various conferences conducted by regional educational organizations, such as the East Asian Regional Conference of Overseas Schools, and that the cost was reported as a general and administrative expense in the financial statements. She testified that, to the best of her knowledge, there was nothing-contained in the financial reports or in the Form 990 that reported grants to individual students or schools. I conclude that Dr. Nieklas was mistaken in his testimony regarding individual grants to students and schools, and that the only gi’ants made were, as Ms. Logorda described them, speaker fees for appearances at conferences devoted to the professional development of the international schools’ faculty.
Finally, during the time period in issue, ISS commenced a program of owning and managing international schools. In 2002, *465 it entered into an agreement to purchase (through a subsidiary, ISS (Cayman) Ltd.), a school in the Cayman Islands. Subsequent to the period in issue here, it acquired four other schools. According to Dr. Nicklas, ISS received requests from communities where there was no appropriate English language American education, and it began to acquire or open schools in those communities to satisfy the needs of dependents of American personnel.
As noted in this court’s decision on the motion for summary judgment, ISS’s audited financial statements for the fiscal years ending June 1998 through 2003 indicated that its principal programs have consistently operated at a profit, although ISS frequently experienced substantial overall net losses from operations. International Schs. Servs., Inc. v. West Windsor, supra, 21 N.J.Tax at 562. The opinion concluded that the losses were a consequence of relatively large general and administrative expenses. Id. at 563.
At trial, Mr. Scinto testified as to how the revenues and expenses for each of ISS’s major program areas—teacher recruitment and placement, schools supplies procurement, schools management, foundations management, and publishing—were accounted for. He explained that the audited financial statements for ISS did not show the allocation of overhead to each of ISS’s programs. He stated that the allocation was shown in ISS’s monthly financial statements. No such monthly reports were in evidence.
Ms. Logorda testified that, for purposes of trial, she had prepared a statement of ISS net surplus (or loss) by program with overhead allocated by program, and she explained in general terms how that allocation was made. For example, the accounting department allocates costs based on the revenue generated by each program, and IT (presumably information technology) and human resources are allocated by the number of staff supported by each program. The statement prepared by Ms. Logorda indicated that, taking into account allocated overhead and administrative expenses, the school management program operated at a profit for all years from 1998 through 2004, and that the school staffing program has operated at a profit since 2001. Foundations *466 management was profitable in 2000 and 2001, but has operated at a loss since then. The school supply procurement program operated at a loss for all years. There was no separate line item for publications, but rather, for “planning and communications.” There was no testimony about the functions included in that item, and it appears to include more than the newsletter and directory. The Cayman International School operated at a loss in 2003 and 2004, the years immediately following its acquisition by ISS through a subsidiary. The statement prepared by Ms. Logorda indicated that, including program income, rental income and income from investments, after allocation of administrative and general expenses, ISS had the following net surpluses and losses (indicated in parentheses) for the years 1998 through 2004:
1998 ($920,312)
1999 ($853,448)
2000 $ 74,286
2001 $418,218
2002 ($201,238)
2003 ($ 39,595)
2004 ($478,384)
Mr. Scinto testified that ISS had reserves of approximately $3 million during the tax years in issue, and that it has generally remained at approximately that level in recent years. He stated that in the years in which ISS realizes an increase in its assets, that is, when its revenues exceed its expenses, it either puts the money back into the various service programs, or into investments, and that reserve constitutes ISS’s “rainy day” fund to see ISS through a few months of operations in the event of any disruption in revenues due to, for example, unrest in a part of the world in which schools it serves are located.
Dr. Nicklas testified that, in the late 1990’s, it became apparent to ISS that the schools it serviced needed other services in addition to the educational services that ISS had been performing, and in particular*, services related to teachers’ salaries and benefits. In his deposition testimony, Dr. Nicklas explained that through its school survey, ISS learned that schools were interested in better health benefits and better retirement plans for its *467 staff, and in obtaining capital to develop school buildings. ISS initially formed strategic alliances with certain for-profit providers of services that were marketed to international schools. ISS received between $50,000 and $75,000 in endorsement fees from one such provider, Insurance Services International, $50,000 of which was received during 2002, one of the years in issue here. Dr. Nicklas testified at trial that ISS learned that it could not continue to work with profit-making organizations in this way and maintain its status as a Section 501(c)(3) organization (26 U.S.C. § 501(c)(3)), exempt from federal income taxes.
Dr. Nicklas testified at his deposition that, after consulting with business and education experts, and working with general and special legal counsel, ISS set up a structure that would permit it to work with for-profit organizations in providing services for international schools while maintaining its federal tax-exempt status and at the same time, to direct the profits that are created by such an association or partnership to fund the not-for-profit activities conducted by ISS itself. The organization created to separate these for-profit activities from ISS’s not-for-profit mission, was International Schools Foundation (“ISF”). ISF was formed in 1999 as a New Jersey nonprofit corporation, to be operated exclusively for the support and benefit of ISS. Under its certificate of incorporation, it was authorized to distribute funds and make contributions to ISS, and to acquire, manage, use and dispose of any property for the purpose of benefiting and supporting ISS. Dr. Nicklas described ISF as the sole member of ISS, or, effectively, as the parent of ISS. In August 1999, a New Jersey for-profit corporation called the Independent School Group, Inc. (“ISG”) was formed to engage in any and all activities permitted under the New Jersey Business Corporation Act. Its certificate of incorporation stated that the corporation expected to be engaged in establishing partnerships with other for-profit organizations, capital development, cash management, and the administration of individual retirement plans. According to its federal income tax returns filed for the periods July 1, 2001 to June 30, 2002 and July 1, 2002 through June 30, 2003, all of the stock of ISG was owned by ISF.
*468 In 1999, ISS and ISF requested a letter ruling from the Internal Revenue Service (“IRS”) to the effect that: (1) ISF is a tax-exempt organization under I.R.C. § 501(c)(3); and (2) ISG’s for-profit activities would not jeopardize the federal tax-exempt-status of either ISS or ISF. The request stated that ISF’s only-activities would ’be to assist ISS to achieve its exempt purposes of supporting, providing and encouraging American style education overseas by providing money to ISS which ISF receives as a result of its fund raising programs and from distributions from ISG. The request further represented that:
Initially, ISF will share all facilities, equipment, employees and other assets in allocated portions with ISS which will be accurately recorded on each company’s books and records. ISF will reimburse ISS, at a fair rental value, for the use of the facilities, equipment and other assets owned by ISS. Likewise, shared employees will be compensated by each company in accordance with the amount of time such employees devote to each company. This practice will decrease substantially once ISF is able to establish itself at a separate office and hire its own employees.
With respect to ISG, the letter set forth the proposed activities of the company as set forth in its certificate of incorporation, and noted that ISG’s initial board of directors had seven members, only one of whom, Dr. Nicklas, was also a trustee of ISF and ISS. The letter represented that:
Initially, ISG will share certain facilities, equipment and other assets in allocated portions with ISS which will be accurately recorded on each company’s books and records. All of its relationships with ISF and ISS mil be at arms length. Therefore, ISG mil reimburse ISS, at fair rental value, for the use of the facilities, equipment and other assets owned by ISS. It is not anticipated that any employees of ISG will be shared with either ISF or ISS. However, if such sharing of emj)loyees is required, all shared employees will be compensated by each company in accordance with the amount of time such employees devote to each company. It is anticipated that ISG will eventually be located at a separate office. It is important to note that ISG, at all times, will maintain separate bank accounts and have its own stationery and telephone lines.
ISG intends to make periodic distributions to its parent company, ISF. In turn, ISF will use a portion of these funds to operate its company, and will contribute the remainder to ISS to assist this non-profit company achieve its Exempt Purposes.
The IRS issued a letter ruling on June 20, 2000, making the rulings that ISF and ISS had requested.
In addition to serving as the president of ISS, and as a board member of ISS and ISF and as chairman of the board of directors of ISG, Dr. Nicklas assumed the duties of president of ISG during *469 the tax years in issue. He received no separate compensation from ISG or ISF. According to his trial testimony, he helped set up meetings and “promoted] services” on behalf of ISG. Sandra Logorda, the chief financial officer and board treasurer at the time of trial and director of accounting for ISS during the time period in issue, testified that as part of her job responsibilities during that time period she “offered any assistance as necessary on the for-profit affiliates,” ISG and ISSFIN (identified in more detail below).
As noted in ISS’s financial statements as of June 30, 2001 and 2000, ISS provided start-up funding for both ISF and ISG, and in January 2000, ISS entered into an unsecured line of credit agreement to provide operating capital for ISG in an amount not to exceed $100,000, increased in September 2000 to $300,000, and again in September 2003 to $400,000. Disbursements under the line of credit were said to earn interest at 8% until January 2000, and then at prime plus 1% thereafter. Interest payments were due monthly and principal was due in January 2003. As of June 30, 2000 and June 30, 2001, ISG owed ISS $49,247 and $192,105, respectively. Subsequent financial statements for ISS indicated that ISG’s debt to ISS had increased to $302,574 as of June 30, 2002, and to $318,965 by June 30, 2003. ISS received interest payments from ISG of $622, $8,664, $16,446, and $15,241 for the fiscal years ending June 30, 2000, 2001, 2002, and 2003, respectively. There is no indication in the financial statements for the fiscal year ending June 30, 2003, that ISG had paid the principal amount of the loan that was originally due in January 2003.
Dr. Nicklas testified that ISG had no income during the period 2002-2003, but its federal income tax returns for the periods July 1, 2001 to June 30, 2002 and July 1, 2002 to June 30, 2003 (both signed by Dr. Nicklas), indicated that ISG had income of $11,588 for the year ending June 30, 2002, but had sufficient deductions so that it had no tax liability. For the year ending June 30, 2003, the tax return indicated that ISG had income of $21,052, but no taxable income after deductions. The tax returns stated that ISG was in the business of cash management. The returns did not indicate the source of ISG’s income, other than relatively minor *470 amounts of interest income. The bulk of ISG’s income in both years was reported as gross receipts or sales.
During 2003, ISG together with Gables Financial Group (“Gables”) formed an entity called ISS Financial and Insurance Network, Inc. (“ISSFIN”), with ISG having a fifty-one percent ownership interest and Gables having the remaining forty-nine percent. ISSFIN and Gables, like ISG, are for-profit entities. Dr. Nicklas was questioned on cross-examination about a press release announcing the formation of ISSFIN. He identified the document as a press release but stated: “I don’t know if ISS released it.” He did not deny that it had been released by someone.[7] The document was dated April 14, 2003 with a “dateline” of “Princeton, NJ” (a part of ISS’s mailing address at the subject property) and “Coral Gables, FL,” the location of Gables. The document bore the heading “ISS and GFC Announce Formation of Financial and Insurance Network.” The document stated that ISS and Gables were announcing the formation of a financial and insurance services brokerage to be headquartered in Coral Gables, with a regional sales and marketing office at ISS headquarters in Princeton. It quoted Dr. Nicklas, identified as the president of ISS, as saying, “It was simply a matter of finding partners and personnel with the right experience and same vision as ISS.” According to the document:
[ISSFIN] will serve the market with a full slate of insurance products and services for teachers and administrators, including medical, life, and disability products, as well as various business and liability coverages for the international schools. In addition, [ISSFIN] is currently marketing products for individual financial security through a strategic partnership with Raymond James Financial, and has entered negotiations for a strategic alliance to provide capitalization products for schools.
ISS was formed in 1955 to serve the interests of the international school community, and provides personnel recruiting, operations management, and purchasing services to school, foundations and other teaching facilities (such as hospitals). John Nicklas says, “Providing financial and insurance products is a natural extension of our original mission.”
*471 The press release directed those needing more information to two persons, one of whom Dr. Nicklas identified as a consultant of ISG. The telephone number given for him was the number listed by ISS on its letterhead for its headquarters at the subject property. Nowhere in the press release was there any mention of ISG. On cross-examination, Dr. Nicklas conceded that the press release could be construed as announcing that ISS was entering into a partnership with a profit making entity. He also affirmatively answered the question: “Do you believe that Gables Financial Group, Inc. was using the reputation and standing of ISS in the international community to make a profit?”
Mr. Scinto testified that prior to the formation of ISSFIN, ISG had a contractual relationship with Raymond James Financial Services (“Raymond James”), whereby ISG received some financial compensation from Raymond James. Mr. Scinto was uncertain of the percentage and did not elaborate as to the base on which the percentage was computed. Ms. Logorda testified that ISG entered into an investment services agreement in February 2000 with James T. Barnett, a certified financial planner and securities agent of Raymond James, a registered broker/dealer. The agreement allowed Mr. Barnett to “go out and service the international community” on ISG’s behalf. According to a note to ISS’s financial statements as of June 30, 2002 and June 30, 2001, commencing in September 2000, ISS offered its overseas staff[8] an alternative investment plan through arrangements with Raymond James, whereby ISS matched participant contributions up to 5%.
The property that is the subject of these appeals was (and continues to be) the ISS headquarters and it was the only property occupied by ISS, apart from some leased warehouse space. The subject property housed the ISS home staff of about fifty people. About ten of those fifty were senior staff who often had been in an American international school, and who oversaw or *472 supervised the development of the service programs. The remaining forty employees were support staff.
The salary of the senior staff of ISS was based on the ISS compensation committee’s review of reports of salary and benefits information for other non-profit organizations, focusing particularly on the east coast and the Philadelphia-New York corridor. Dr. Nicklas’s salary as ISS’s president, was determined by the ISS board of directors, who conducted a survey of the salaries of chief executive officers of not-for-profit organizations of a similar size in New Jersey. The board also took into account the salaries of the superintendents of international schools, because that is the group from which ISS drew its senior staff. According to the ISS Form 990 income tax return filed for the period July 1, 2001 through June 30, 2002, Dr. Nicklas received a salary of $255,722 and a benefits package valued at $36,885.
ISS did not need all of the square footage that it owned at the subject property and therefore leased some space to unrelated tenants both not-for-profit and for-profit organizations. It does not claim any exemption for space leased to for-profit organizations, and the defendant and ISS have, over the years, apparently agreed upon the portion of the property that is subject to local property taxation on account of those for-profit tenants that are unrelated to ISS and ISS has paid property tax on the space it rents to unrelated for-profit entities. No proofs were presented as to the space occupied by unrelated entities and no issue was presented at trial regarding the taxability or exemption of that space.
In his deposition testimony submitted in the earlier motion for summary judgment, Dr. Nicklas stated that neither ISF nor ISG occupied any separate space at the subject property. The trial testimony was somewhat different. Ms. Logorda testified as to the physical layout of the space used by ISS and its affiliated entities at the subject property, based upon a floor plan, and also on a chart she had prepared that set forth the name of all entities occupying space at the subject property, the condominium unit number in which that entity occupied space, the square footage *473 devoted to that occupant, and the dollar amount of property taxes attributed to each occupant for the period 2001 through 2006. According to Ms. Logorda’s chart, 1400 square feet owned by ISS were dedicated to ISSFIN and 600 feet owned by ISS were dedicated to ISG. The spaces dedicated to ISSFIN and ISG were immediately adjacent to space occupied by ISS and opened directly on to a common hallway. These spaces appear to have been carved out of ISS space because there were no separate reception areas or restrooms for the ISSFIN and ISG space.
The allocation of taxes included in Ms. Logorda’s chart was done on a per square foot basis, with all common areas, such as hallways and restrooms attributed to ISS. Ms. Logorda stated that no space was allocated to ISF, although it used the address of the subject property. Ms. Logorda testified that although there was office space dedicated to ISG, no one actually occupied that space during the tax years in issue because the person originally hired as president of ISG was no longer with the organization. According to Dr. Nicklas, that person left shortly after August 31, 2001, when Dr. Nicklas assumed the duties of president of ISG. Dr. Nicklas’s office was in space designated as ISS space. Ms. Logorda initially testified that ISS charged rent to ISG at a fair market value. She also testified that the staff of ISS provided start-up accounting services for ISG and continued to maintain its books and records. Notably, the federal tax returns filed on behalf of ISG for the periods July 1, 2001 through June 30, 2002, and July 1, 2002 through June 30, 2003, stated that the paid preparer was a certified public accountant employed by ISS. That function was performed in the ISS offices. Ms. Logorda stated that the staff time and communication charges were charged back to ISG by ISS.
The space allocated to ISSFIN was occupied commencing in May 2003 by John Farrell, who was identified by Dr. Nicklas as a consultant to ISG. Although Ms. Logorda testified that ISSFIN employed its own accountants, its federal income tax return for the period July 1, 2002 through June 30, 2003 listed the paid preparer of the return as a certified public accountant employed by ISS. The return was signed by Dr. Nicklas as chairman of *474 ISSFIN. Ms. Logorda initially testified that ISSFIN leased the space at a fair market value and that ISS recovered the costs of “communications and things of that nature” from ISSFIN. No testimony was offered as to how ISS recovered such costs or on what basis.
Ms. Logorda testified that ISS recognized the importance of arms’ length transactions between ISS and its related entities and that fair market rental had to be charged to ISG and ISSFIN. However, when questioned on cross-examination, as to whether ISS subsidized either ISG or ISSFIN by charging a lower rent than to other tenants, or by allocating costs for insurance and other costs differently than for other tenants, Ms. Logorda responded that she didn’t know because she was not the one who established their lease agreements. She did testify that, to the best of her knowledge, ISG and ISSFIN were allocated charges for taxes in the same way as other lessees.
On cross-examination, Ms. Logorda was shown copies of the annual statements of income and expenses for the subject property for the periods January 1, 2003 to December 31, 2003 and January 1, 2004 and December 31, 2004 that had been filed with defendant’s assessor as required by N.J.S.A. 54:4-34 (commonly referred to as “Chapter 91”). She testified that, while she had not prepared the statements, she had reviewed and approved them.
Ms. Logorda identified the 1400 square feet leased to ISSFIN on the lease schedule of the Chapter 91 filing for the period January 1, 2003 to December 31, 2004. The schedule indicated that the space was leased to ISSFIN commencing in 2003 on a gross rental basis (that is, with the landlord paying all operating expenses) at a rate of $6 per square foot. The remaining leases shown on the schedule were on a shared rental basis (which Ms. Logorda stated meant that ISS and the tenant shared expenses), at rates that ranged from $20 per square foot to $23.10 per square foot. The last rental revisions for those leases had been in 2002 and in 2004, close in time to the May 2003 ISSFIN lease. Ms. Logorda conceded that ISSFIN was being charged about a third or a quarter of what was being charged to other tenants, and *475 could not identify who was assuming the balance of the costs for that rental. She admitted that perhaps the rent of the entities related to ISS had been subsidized. Ms. Logorda also conceded that the space said to have been leased to ISG was not listed on the lease schedules at all. She testified that it was being used by ISS for storage, and ISG did not pay any rent at all during 2003 and 2004.[9]
Although the chart and floor plan prepared by Ms. Logorda did not reflect it, Dr. Nicklas testified at his deposition that from approximately 2002 to sometime in 2003, ISS also leased space to Insurance Services International, the insurance brokerage with which ISS had formed a strategic alliance (and which had paid an endorsement fee to ISS) prior to the formation of ISSFIN. No documentation as to the terms of the lease with that entity was provided.
As discussed above, the issues for determination by the court are whether the subject property was actually used for the tax exempt purpose; and whether the operation and use of the property were conducted for profit. N.J.S.A. 54:4-3.6; Paper Mill Playhouse, supra, 95 N.J. at 506, 472 A.2d 517. The entity claiming exemption has the burden of establishing its entitlement to the exemption, Princeton University Press, supra, 35 N.J. at 214, 172 A.2d 420, and in making a determination as to whether property is exempt, courts are directed to construe the exemption statute against the claimant. Ibid. At the same time, neither the statutory language nor the legislative intent should be distorted. Paper Mill Playhouse, supra, 95 N.J. at 507, 472 A.2d 517. While the construction of the statute must be strict, it must be reasonable and not used to defeat the evident legislative purpose. Ibid.
As a starting point, it is helpful to refer to the Appellate Division decision in this matter. That court found:
*476 [ISS’s] goal [when it was founded] was “to remedy the shortcomings of overseas schools in which American children were enrolled and to serve the children by enhancing the quality of their education.” The intent of ISS was to further bolster this effort by fostering “the mutual understanding between the people of the United States and those of other countries by demonstrating the benefits of American-style education.” ... [This] suggests a general intent to promote its activities among the public in general which has, as a benefit the “moral and mental improvement of men, women and children.”
[International Schs. Servs., supra, 22 N.J.Tax at 662 (emphasis added) ].
The court also concluded that ISS’s certificate of incorporation did not foreclose its pursuit of the general public purpose as required by Bloomfield Town v. The Academy of Medicine, 47 N.J. 358, 362, 221 A.2d 15 (1966). International Schs. Servs., supra, 22 N.J.Tax at 663. The Appellate Division iterated that ISS was founded “to ‘aid, promote and encourage’ its goals by way of any ‘appropriate means’ ... [which] could include, among other things, the education of the public at large about ISS’s purposes and concerns.” Ibid. Finally, the court once again noted that an entity must “perform! ] an important public service through its activities which promote ‘the moral and mental improvement of men, women and children,’ ” in order to be eligible for the exemption. Id. at 664 (quoting Academy of Medicine, supra, 47 N.J. at 366, 221 A.2d 15).
As I read the decision of the Appellate Division and the cases it cites that have construed the “moral and mental improvement” exemption, including Paper Mill Playhouse, supra, Academy of Medicine, supra, and Chester Theatre Group v. Borough of Chester, 115 N.J.Super. 360, 279 A.2d 878 (App.Div.1971), the general educational purposes of the entity claiming exemption must be directed toward the general public. Paper Mill Playhouse presented a wide variety of cultural events, including musical and dramatic plays, ballets, other musical programs in connection with other cultural groups, and children’s cultural programs. 95 N.J. at 507, 472 A.2d 517. Its programs were open to anyone who purchased a ticket, and the organization discounted ticket sales to senior citizens and students. Id. at 510, 472 A.2d 517.
A theater property acquired by the Chester Theatre Group, whose corporate purpose was “to stimulate, perpetuate and develop interest in the dramatic arts and to educate the general public *477 in the arts,” Chester Theatre Group v. Borough of Chester supra, 115 N.J.Super, at 362, 279 A.2d 878, was similarly used for drama workshops, plays, displays of art and musical productions. Membership in the group was open to anyone, but one did not need to become a member in order to participate in the group’s activities. Ibid.
The Academy of Medicine of New Jersey was organized for the purpose of “pathological and anatomical study and investigation, and the advancement and promotion of medical and surgical science, by such means as to them shall appear expedient and proper, and also maintenance of a public medical library.” Bloomfield Town v. The Academy of Medicine, supra 47 N.J. at 362, 221 A.2d 15. The subject property housed the executive offices of the Academy, and was the administrative center for educational courses for physicians and dentists conducted elsewhere. The Academy also sponsored symposia (generally conducted off-site) on medical subjects of broad general interest, which were open to the public, and published a bulletin providing current medical information and reporting on the Academy’s symposia. Id. at 362-63, 221 A.2d 15. The Court determined that the subject property was eligible for exemption as used in the work of a corporation organized exclusively for moral and mental improvement of people, emphasizing that the Academy made the educational benefits provided by it available to the general public to the maximum degree possible. Its library and its symposia were open to all and its bulletin was circulated throughout the world. Id. at 365, 221 A.2d 15. While membership was restricted to doctors and dentists, its educational programs and benefits were available to everyone, thereby performing an important public service. Id. at 366, 221 A.2d 15.
At its inception, the founder or founders of ISS clearly had a notion that assisting international schools to provide a first-rate American-style education to Americans and other expatriates living overseas would promote international understanding and as a by-product, world peace. As suggested by the Appellate Division, the promotion by ISS of international schools and their benefits among the general public might result in the moral and mental *478 improvement of men, women and children. International Schs. Sews., Inc., stupra, 22 N.J.Tax at 662. There is no question that ISS provides valuable services to international schools, but I conclude that those services are not in the nature of important public services of the type that have been found eligible for the moral and mental improvement exemption.
The available evidence indicates that ISS aids and encourages the international schools it serves. ISS serves the practical needs of those schools, making available teachers and administrative staff, procuring school supplies, and managing their ordinary and extraordinary business needs. I find virtually no evidence suggesting that ISS promoted the goals set forth in its certificate of incorporation (as amplified by Dr. Nicklas’s statements regarding its founders’ purposes) among the public at large or that ISS educated the general public about its purposes and concerns. Its activities were directed at the international schools themselves, to the staff at those schools, to candidates for teaching positions at those schools, and to parents whose children attended or might attend one of those schools in the event that they were posted abroad. The only evidence that ISS served the general public at all was testimony by Dr. Nicklas that ISS sent its newsletter to anyone who requested it. The newsletter was a relatively minor function performed by ISS. The financial statement for the fiscal years ending June 30, 2001 and June 30, 2002 indicated that only 0.4% and 0.2%, respectively, of operating revenues were derived from publications (which included both the newsletter and the directory), and that only 0.2% of operating expenses were attributable in both years to publications. There was no testimony as to precisely how much of the space occupied by ISS in the subject property was devoted to that activity.
As reflected in his trial testimony when responding to questions inquiring how a particular service fulfilled ISS’s corporate purposes as set forth in its organizational documents, Dr. Nicklas saw ISS’s mission as advancing education by assisting international schools. As summarized by Dr. Nicklas on the ISS website,[10]
*479 Our mission at ISS is to advance the quality of education for children in international schools by providing services, innovative solutions and resources to learning communities and corporations throughout the world. Our ultimate focus is students and, in order to reach them, we work closely with all groups involved in the educational process—parents, teachers, administrators, boards, local agencies, governments and international corporations.
None of the activities described by Dr. Nicklas or by the other witness produced by ISS, provided any benefit to the general public. ISS argues that its activities fulfilled a general public purpose because they enhanced the quality of education at international schools and fostered the mutual understanding between the people of the United States and those of other countries by demonstrating the benefits of public education.[11] I find that the activities of ISS conducted at the subject properties benefited the international schools and enabled those schools to provide an enhanced education. Perhaps those schools also fostered understanding between persons of different nationalities, although there was no testimony indicating that this was, in fact, a goal of the schools.
In either event, it is the schools that were performing those activities and not ISS. As noted in this court’s decision on the summary judgment motion, International Schs. Servs., supra, 21 N.J.Tax at 569, and not contradicted by the Appellate Division, the availability of the moral and mental improvement exemption has been limited to organizations that directly rather than indirectly seek to uplift the general public morally and mentally. The cases cited by the Appellate Division, summarized above, each involved the property of an organization whose activities were available to the general public, and those activities were intended to uplift the general public. To hold otherwise would make any organization supporting the actual provider of activities that mor *480 ally or mentally uplift the general public, whether through services or donations of funds, eligible for exemption. That has not been the law.
While the education of American students and other foreign nationals abroad is undoubtedly a public purpose, that is not the purpose or function of ISS. Its purpose is assisting schools in providing that education, and its activities center exclusively on aiding, promoting and encouraging international schools by providing services to the schools, them faculty and, through their publications, to the parents of potential students. There was no evidence that ISS promoted its activities among the public in general or that it educated the general public about its purposes and goals, except to the limited extent that a member of the general public may have became aware of its newsletter or stumbled upon the ISS website.
I also find that ISS operated and maintained the subject property for the purpose of making a profit, as that requirement has been construed by the New Jersey courts. In making that determination, I give no weight to the testimony of a certified public accountant produced by the defendant municipality as an expert witness on the eligibility of an organization for exemption under N.J.S.A. 54:4-3.6. Specifically, the accountant testified as to how the subject property failed to meet the three-prong Paper Mill Playhouse, test, opining that the property must be used exclusively for the exempt purpose. That was true at the time that Paper Mill Playhouse was decided and the Court incorporated in that decision the statutory language existing at that time. Paper Mill Playhouse, supra, 95 N.J. at 514, 472 A.2d 517. However, N.J.S.A. 54:4-3.6 was subsequently amended, L. 1985, c. 395, and now requires only that the property be actually used for the exempt purpose. Because his application of the facts to the statutory requirements was clearly shaped by his misunderstanding of the law, I give it no weight.
As noted by ISS in its post-trial brief, the amendment permits an organization whose property would otherwise be eligible for exemption to lease portions of that property to other organizations *481 that are not exempt from taxation, and still be eligible for exemption on the portion of the property devoted to the exempt purposes. ISS points out that it is not claiming exemption for the portions of the property dedicated to 1SG and ISSFIN or to other profit-making entities to which it leases space that ISS does not itself require. ISS maintains that it is entitled to exemption on the remainder of the subject property.
N.J.S.A. 54:4-3.6 requires, in relevant part, that the properties for which exemption is claimed “are not conducted for profit, except that the exemption of the buildings and lands used for charitable, benevolent or religious purposes shall extend to cases where the charitable, benevolent or religious work therein carried on is supported partly by fees and charges received from or on behalf of beneficiaries using or occupying the buildings; provided the building is wholly controlled by and the entire income therefrom is used for said charitable, benevolent or religious purposes.” The Court in Paper Mill Playhouse firmly rejected the argument that because the theater occasionally produced financially profitable productions, and at times realized a profit and generated a surplus, it was a commercial enterprise. Paper Mill Playhouse, supra, 95 N.J. at 520-21, 472 A.2d 517. As also noted by the Court, the facts in that case did not support the allegations that profitability was a consideration in determining which shows to produce, or that Paper Mill was conducted for the purpose of making a profit. The court found that there must be a pragmatic inquiry, with a realistic, common sense analysis of the actual operations of the taxpayer. Id. at 521, 472 A2d 517. There must be an analysis of where the profit goes, and the crucial inquiry is “Who gets the money?” If it can be traced into someone’s personal pocket, the organization is not entitled to exemption. Id. at 522, 472 A2d 517. Moreover, “[a]s long as salaries are not excessive, the mere payment of them is not sufficient grounds for denying the tax exemption.” Ibid.. The Tax Court recently applied this test in Hunterdon Medical Center v. Township of Readington, 22 N.J.Tax 302 (Tax 2005), aff'd, 391 N.J.Super. 434, 918 A.2d 675 (App.Div.2007), rev’d in part on other grounds, 195 N.J. 549, 951 A.2d 931 (2008), concluding that *482 property was not eligible for exemption where it was used for a medical practice in which the physicians received a portion of net revenues in addition to their salaries. Id. at 319, 951 A.2d 931. The court found that a portion of surplus revenues could be traced to someone’s pocket.
There was no evidence in this case that the salaries paid by ISS were excessive. However, the proofs indicated that ISS provided space to ISSFIN and ISG, both profit-making entities at rentals substantially below the rates charges to other tenants, and that except for reimbursement for telephone and fax charges, ISS covered all utility, tax and insurance charges for the space attributable to those properties. As conceded by Ms. Logorda, that evidence indicated to her that ISSFIN and ISG were being subsidized. In the absence of any evidence to the contrary, I must conclude that the funds for that subsidy came either from (1) ISS’s operating income, which, according to Dr. Scinto, would otherwise have been applied to the purposes for which exemption was claimed, or to surplus for eventual use in conducting those same activities; or (2) from ISS surplus itself.
The mission of ISG was to enter into partnerships with purely profit making entities, such as it did with Gables in forming ISSFIN. As explained by Dr. Nicklas, those partnerships were intended to produce income to ISG, which would distribute the income to its sole shareowner ISF which, in turn, would use any distributions from ISG to support ISS. The point is not, however, that ISS was an ultimate beneficiary of the subsidy provided to ISSFIN and ISG by way of rent and other expenses at the subject property, but rather that ISSFIN and its shareholder Gables, also were the beneficiaries of that subsidy. Similarly, those entities received without charge the benefit of Dr. Nieklas’s services. There was no evidence that the cost of his services was “charged back” to ISG or ISSFIN, but only that departments such as accounting, IT and human resources had a method of allocation. In other words, ISS funds “went into the pockets” of Gables, ISG’s partner in ISSFIN.
*483 There is also the matter of the line of credit extended by ISS to ISG. While ISS explains this as just another investment, it was an unsecured loan to a new entity that produced little income. ISS nevertheless increased the amount of the line of credit from $100,000 to $400,000 between January 2000 and September 2003. ISS’s investment of its surplus, as listed on its federal income tax return for the period July 1, 2001 and June 30, 2002, consisted of a substantially different type of investment, namely, what would have been regarded at that point in time as solid corporate stocks and bonds, U.S. Treasury notes and the bonds of government agencies such as the Federal National Mortgage Association. I find that the line of credit to ISG came from ISS operations or surplus and was provided to a related entity organized specifically for the purpose of making a profit.
Finally I also conclude that ISS intended to use its name to promote the joint profit-making ventures. As conceded by Dr. Nicklas, he believed that Gables Financial Group, Inc. was using the reputation and standing of ISS in the international community to make a profit. The promotion of ISSFIN by ISS was conducted out of or by persons working at the subject property. This is evidenced by the following statement of Dr. Nicklas that appeared on the ISS website in 2004, subsequent to the tax years in issue here:
So the dawn of this 21st century finds ISS still serving its original mission, but expanding its role in service areas. The ISS Financial Network (ISSFN) provides money and asset management products that will be a valuable complement to the Foundation and payroll services ISS has offered schools since 1968. Schools will be able to build financial stability and fund new education programs through the aggregate benefits of these financial management services. ISSFN will expand the range of insurance, investment opportunities, and retirement options for educators to assist them in creating satisfying and rewarding careers. The success of these educators, and the stability they achieve personally and professionally as employees of international schools, will help them as they work shaping tomorrow’s world leaders.
It should be emphasized that these promotional statements were made by Dr. Nicklas on behalf of ISS, presumably from his ISS office, and not by ISSFIN in the space allocated to it.
For the foregoing reasons, I conclude that subject property of ISS was not eligible for exemption for tax years 2002 and 2003.
*484 The Clerk of the Tax Court will be directed to enter judgment in the amounts previously stipulated to by the parties, as follows:
Block: 9
Lot: 63.11 .
Street Address: 15 Roszel Road, Unit 1
Tax Year: 2002 and 2003
Land: $ 465,000
Building: $1,156,700
Total: $1,621,700
Block: 9
Lot: 63.13
Street Address: 15 Roszel Road, Unit 3
Tax Year: 2002 and 2003
Land: $ 191,600
Building: $ 476,800
Total: $ 668,400
Block: 9
Lot: 63.14
Street Address: 15 Roszel Road, Unit 4
Tax Year: 2002 and 2003
Land: $ 133,600
Building: $ 21,600
Total: $ 155,200
Block: 9
Lot: 63.15
Street Address: 15 Roszel Road, Unit 5
Tax Year: 2002 and 2003
Land: $ 416,800
Building: $ 67,600
Total: $ 484,400

 In addition to claiming exemption, the complaints originally contested the assessed valuations oí the subject property. Following entry of the summary judgment order, the parties hied a stipulation as to the value of the subject condominium units for both of the tax years in issue.

 Since his retirement in 2005, Dr. Nicklas has been working for ISS as a consultant, receiving about $110,000 to $120,000 per year, before taxes.

 The certificate of incorporation in evidence is dated April 25, 1990 and was filed in the District of Columbia on May 1, 1990. It is unknown whether this certificate amended an earlier certificate, or whether ISS was originally formed as an unincorporated association of some type.

 The parties agreed that the evidential material submitted in connection with the summary judgment motion (including Dr. Nicidas' deposition testimony) was to constitute part of the record in these matters.

 While ISS does not itself conduct any fund-raising for schools or their foundations, it may refer a school to a fundraiser.

 A press release dated June 23, 2003 with substantially the same content was also in evidence. Dr. Nicklas could not say whether the first was a draft version of the second.

 Mr. Hove indicated that some teachers working overseas at international schools were under contract directly with ISS rather than with the schools at which they taught.

 The lease document for ISG indicated that its rent was $500 per month, including utilities. Ms. Logorda’s chart stated that 600 square feet were dedicated to ISG, making its annual rental $ 10 per square foot.

 The statement is taken from a page of the website printed in 2004. Its content is substantially the same as Dr. Nicklas' trial testimony.

 There is no evidence that these schools were “public" in the sense that the term is used in the United States. Mr. Hove testified that tuition was paid directly by parents except in some cases where schools were supported by corporations or other organizations employing the students' parents. There was no evidence that the education provided was free. Dr. Nicklas’s testimony that ISS provided grants to individual students was not supported by the documentary evidence or by the testimony of his former colleagues. I conclude that these were essentially private schools.